**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NATIONAL JOCKEY CLUB,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **04 3743** |
| | ) | |
| **FLOYD "CHIP" GANASSI and CHIP** | ) | |
| **GANASSI GROUP, L.L.C.,** | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM AND ORDER

This case flows from the transformation of Sportsman's Park, a horse racing venue in Cicero, Illinois, owned by plaintiff National Jockey Club ("NJC"), into the Chicago Motor Speedway ("CMS"), an ultimately unsuccessful facility for horse and auto racing. To effect this transformation, NJC and defendant Ganassi Group formed CMS, an Illinois limited liability company. Construction was financed through a $60 million construction loan and capital contributions by NJC and Ganassi Group. Pursuant to a lease between NJC and CMS, CMS was responsible for paying the principal and interest on the construction loan as it came due. In addition, defendant Floyd "Chip" Ganassi, who is involved in professional motor racing as both a driver and operator of motor racing teams in the United States, personally guaranteed CMS's obligations under the lease up to $22.5 million, although that amount was subsequently reduced to $10.5 million.

CMS was ultimately unable to prosper and thus ceased operations.[1] NJC filed suit against

---

[1] CMS lives on, however, via Sylvester Stallone's commercially unsuccessful 2001 movie, *Driven*, which was shot mostly at CMS during its brief heyday.

Ganassi and Ganassi Group alleging breach of guaranty against Ganassi (Count I).[2]  Ganassi and

Ganassi Group also have pending amended counterclaims in which they allege breach of

guaranty (Count I), breach of contract (Counts II and IX), breach of fiduciary duty (Counts III and

IV), fraud and misrepresentation (Count V), and unjust enrichment (Counts VI and VII).[3]  They

also request rescission and restitution (Count X).  Numerous motions in limine are presently

before the court and are addressed by this order.

## I.      Standing – Harris Bank Note

The court begins with the threshold issue of NJC's standing to pursue this action, which

remarkably is being presented to this court in 2009 as part of a motion in limine.  Both NJC and

the defendants filed motions in limine relating to the effect of NJC's assignment of a Harris Bank

note and the subsequent sale of that note to an entity called DII Northwest.

### A.      Background

The court begins with some brief background facts.  As noted above, in this action, NJC

seeks to enforce a personal guaranty executed by Mr. Ganassi guaranteeing the obligations of

CMS under CMS's lease with NJC.  Under the lease, CMS was obligated to pay as rent funds

sufficient to cover the principal and interest as it came due on the construction loan taken out by

NJC to fund construction of CMS.  The construction loan was made by a syndicate of banks led

by Harris, and the loan was secured by, among other things, a mortgage on Sportman's Park, the

---

[2]  NJC recently voluntarily dismissed its other claims for breach of fiduciary duty against
Ganassi Group (Count II) and promissory estoppel against Ganassi and Ganassi Group (Count
III).  *See* Docket No. 150.

[3]  The defendants also had a counterclaim for conversion (Count VIII), which they
recently voluntarily dismissed.  *See* Docket No. 150.

real property owned by NJC upon which CMS was to be constructed.  At the time NJC entered into this financing arrangement, it executed an Assignment of Leases and Rents ("Assignment") with Harris.

The Assignment provided that NJC assigned the rights to "earnings, renewal rents, and all other sums due which may hereafter become due under or by virtue of the leases and all rights under guarantees or against guarantors of the obligations of lessees under such leases including, without limitation, the personal guaranty of the Speedway Lease provided by Chip Ganassi (individually a "Lease" and collectively the "Leases").  It then provided that if no act of default occurred, NJC retained the right to "enforce the obligations of any lessee under any lease."  The final relevant provision in the Assignment states that if an act of default occurred, "the assignee [Harris] may at its option to the extent permitted by law . . . (ii) with or without taking possession of the premises, proceed to enforce the leases and collect all sums due or to become due thereunder."

By 2002, CMS ceased operations and defaulted on the loan.  Harris and the syndicate banks declared the loan in default and instead of foreclosing, Harris sold the property to the Village of Cicero and used the proceeds to reduce the amount owed to Harris and the syndicate banks.  Even after selling off the property, the banks were owed more than $24,000,000.

In 2006, while this case was pending, Harris sold the note to DII Northwest, who called the note.  Since NJC could not cover the amounts it owed, it filed for bankruptcy protection.  In the bankruptcy case, the parties reached a settlement regarding the distribution and allocation of any proceeds recovered by NJC in this case.

NJC argues that evidence about the note should be excluded because it is irrelevant to the issues before the court as well as confusing. The defendants contend that NJC lacks standing to prosecute this action because it assigned the guaranty to Harris, which in turn sold its rights to DII. The defendants also assert that certain witnesses stand to financially benefit if judgment is entered in favor of NJC pursuant to the settlement in the bankruptcy case, and that they should be allowed to cross-examine the witnesses to explore this bias.

**B.     Standing**

The language of the Assignment expressly provides that the guaranty is considered a lease, since the definition of "lease" includes Mr. Ganassi's guaranty. The assignment to Harris did not assign 100% of NJC's rights away. Specifically, NJC retained the right, prior to any default, "to enforce the obligations of any lessee under any lease" (including the guaranty). Following default, the assignee (Harris) had the option to enforce leases (including the guaranty), but was not required to enforce the guaranty. Indeed, in 2003, Harris expressly told NJC that NJC retained the right to enforce the guaranty. After Harris sold the note and Assignment to DII, DII stepped into the shoes of Harris.

The defendants have not pointed to any specific reason why any arrangements NJC made regarding any proceeds it might obtain if it prevails in this case mean NJC lacks standing. This leaves the fact that NJC retained the right to enforce the guaranty. Because it did so, it has standing to pursue its claim for breach of the guaranty. Thus, the defendants' motion in limine No. 12 to preclude NJC's claim under the guaranty based on lack of standing [#175] is denied.

## C.      Evidence about the Assignment and Subsequent Sale

This brings the court to NJC's motion based on the Harris note.  NJC contends that information about the sale of the note and the ultimate recipients of the proceeds of any judgment entered in favor of NJC will be confusing and not aid the finder of fact.  The court agrees:  the complete details regarding the sale of the note and the bankruptcy are extremely convoluted and are not relevant to NJC's claim for breach of the guaranty or the defendants' counterclaims.

The defendants nevertheless contend that they need to introduce evidence about the assignment and sale of the note to DII to show that certain witnesses who will testify at trial have a financial interest in the outcome of this case because they will benefit personally if NJC prevails.  The fact that witnesses have a direct financial interest in the outcome of this case is relevant to their credibility.  *See Crowe v. Bolduc*, 334 F.3d 124, 132 (1st Cir. 2003) (evidence that a trial witness has a financial incentive in the outcome of the trial is "classic evidence of bias, which is routinely permitted on cross-examination").

Nevertheless, the court has broad powers to regulate the nature and extent of any such cross-examination to prevent confusion and prejudice.  At this stage, it is unclear what these witnesses are going to say, the extent of any benefit they might receive from this case if NJC prevails, and whether their financial interest can be explored without going into the details of the transaction at issue.  The court thus must consider the scope of cross-examination at trial.  The court urges the parties to confer and attempt to reach agreement regarding this issue.  Accordingly, NJC's motion to bar any evidence or testimony as to the sale of the Harris Bank note and the beneficiaries and/or recipients of the proceeds of any judgment entered in favor of National Jockey Club [#167] is denied without prejudice.

## II.     National Jockey Club's Motions In Limine

### A.     Conversion

In the defendants' conversion counterclaim, which they recently voluntarily dismissed (Docket No. 150), they asserted that the guaranty amount should be offset by certain monies allegedly owed by NJC.  Certain affirmative defenses raised by the defendants (15 and 18) are also premised on the idea that an offset applies to the guaranty.  In sum, the defendants' position in certain of their affirmative defenses and their now-dismissed conversion counterclaim is that NJC converted monies paid by the defendants to CMS to its own use, in breach of the lease and operating agreement, thereby not only discharging the defendants from the obligation to make any further payments in connection with the CMS project but also discharging Mr. Ganassi from the obligation to make any further payments under the guaranty.  Regrettably, the guaranty itself does not specify what payments will decrease or extinguish Mr. Ganassi's obligations under the guaranty.

In light of the still-pending affirmative defenses that are premised on the idea that the defendants are entitled to an offset, NJC asks the court to bar the defendants from presenting any evidence or testimony about amounts allegedly converted by NJC.  In support, NJC directs the court's attention to authority indicating that "an action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money."  *In re Thebus*, 108 Ill.2d 255, 260 (Ill. 1985).  NJC also contends that in discovery, the defendants and their expert Paul Pocalkyo testified that the claimed offsets are not based on monies allegedly converted by NJC and, instead, are premised on either (1) accounting adjustments or credits owed to them as a member

of CMS, or (2) NJC's failure to use its best efforts to remove or reduce the amount guaranteed by Mr. Ganassi.

In response, the defendants acknowledge that they will not be proceeding on their counterclaim for conversion (Count VIII). They also state that NJC's motion in limine "confuses the legal claim of 'conversion' with the verb 'convert'" and argue that even if they do not assert a legal claim of conversion against NJC, evidence of NJC's conversion of money is at the heart of nearly all of their affirmative defenses, so they should be free to introduce evidence that NJC converted monies. Docket No. 201 at 2-3.

The parties's dispute appears to hinge on a semantic disagreement about the verb "convert." The defendants withdrew their conversion claim, but read NJC's motion in limine regarding conversion as seeking to exclude all evidence that NJC misappropriated money. NJC, on the other hand, appears to simply be trying to prevent the defendants from reintroducing the legal theory of conversion back into this case. With that understanding, NJC's motion in limine to bar evidence relating to a claim that NJC converted monies [#157] is granted, and the defendants may not argue or present evidence to further the theory that NJC is liable for the tort of conversion under Illinois law. Consistent with the remainder of this order, however, they may argue that NJC misappropriated money.

**B.      Damages or Setoffs Other Than Return of the Defendants' $28M Investment**

NJC seeks to bar the defendants from presenting any evidence or testimony relating to individualized accounting damages and/or setoffs other than their claim for the return of their $28 million investment in the Chicago Motor Speedway project. NJC argues that this is necessary because it is consistent with the position of the defendants in discovery since,

according to NJC, the defendants did not break down their alleged damages by pointing to specific accounting errors or omissions, and also did not break down what damages were allegedly owed to each counterclaimant.

This motion in limine appears to be another example of the parties talking at cross-purposes. With respect to NJC's claim that Mr. Ganassi breached the guaranty, the defendants take the position that NJC – not Mr. Ganassi – in fact breached the guaranty, so they are entitled to have their entire investment returned. In contrast, in the defendants' counterclaims, they assert that they are entitled to damages in connection with a variety of alleged accounting improprieties. The court declines to limit the defendants to an all or nothing position across the board that they are entitled to either $28 million or $0. Accordingly, NJC's motion in limine seeking to bar the defendants/counter-plaintiffs from presenting any evidence of damages or setoffs other than their claim for the return of their $28 million investment in the Chicago Motor Speedway Joint Venture [#160] is denied.

## C. Damages in Support of the Defendants' Counterclaims

In its next motion in limine, which is unfortunately overly vituperative, NJC asserts that the defendants should be barred from presenting any evidence of damages in support of their counterclaims because they did not quantify the damages they suffered as a result of NJC's alleged accounting malfeasance and instead only seek return of their entire investment. NJC then argues that return of the defendants' entire investment is only available in connection with the defendants' request for rescission. NJC reasons that to prevail on a claim for rescission, the defendants must establish that it is possible for them to return NJC to its pre-contract state, and concludes that this is impossible given that NJC is bankrupt due to the demise of CMS.

The court begins by noting that NJC's arguments would have been better presented via a dispositive motion, where the court would have had the opportunity to review all of the relevant evidence in the record in an orderly and complete fashion. With this said, NJC's motion is largely but not wholly unpersuasive for three reasons. First, as detailed above, the court has already rejected NJC's claim that the only measure of damages sought by the defendants is the return of their entire investment. Second, even a cursory review of the record shows that the deposition sections highlighted by NJC are not the defendants' sole explanation regarding their alleged damages. Thus, the defendants need not be limited to restitution based on the excerpted deposition sections.

Third, the court disagrees that the defendants can only potentially obtain a refund of all monies paid if they prevail on their rescission claim and that this relief is not available as a matter of law given this case's facts. The remaining counterclaims are for breach of contract (Counts I, II & IX), breach of fiduciary duty (Counts III and IV), fraud (Count V), unjust enrichment (Count VI & VII), and rescission and restitution (Count X). With respect to the breach of contract claim, NJC asserts that "[b]y asking for the return of their $28 million dollar investment, the Ganassi Defendants are asking to be restored to their pre-contract state. They are requesting a determination that no contract with NJC existed at all." Docket No. 163 at 8.

The court reads the defendants' arguments differently: they contend that they are entitled to money damages *or* restitution in the amount of their initial investment.[4] Money damages are unquestionably a standard measure of damages for breach of contract, as is restitution. *See MC*

---

[4] The defendants will have to elect between these remedies at some point, but except as specified in this order, NJC has not established that they must do so at this stage in the proceedings.

*Baldwin Financial Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill.App.3d 6, 18 (1st Dist. 2006) (the "alternative remedies" of restitution and damages can be available in connection with a breach of contract claim). The same can be said for unjust enrichment and breach of fiduciary duty. *See Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill.2d 248, 256 (Ill. 2004) (unjust enrichment); *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) (breach of fiduciary duty). Thus, the request to bar evidence relating to damages in connection to the breach of contract, unjust enrichment, and breach of fiduciary duty counterclaims is denied.

NJC's motion, however, fares better with respect to the fraud counterclaim. It is true that "restitution is equally a legal and an equitable remedy, it can be sought from a jury in a fraud case." *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 578 (7th Cir. 2004). However, restitution is only available as a measure of damages for fraud if the allegedly injured party claims that it is a victim of fraud in the inducement. *See Sciarabba v. Chrysler Corp.*, 173 Ill.App.3d 57, 61-62 (1st Dist. 1988) (party alleging fraud could contend "that he was induced to enter into the contract as a result of fraud and ask to have the contract rescinded and restitution ordered"). The defendants appear to be contending that NJC defrauded them *after* the parties entered into the contract (by engaging in accounting improprieties), as opposed to making a fraud in the inducement claim. Thus, the defendants will be limited to evidence about damages at trial and cannot ask the jury to return them to their pre-contract position by awarding them restitution.

This leaves the defendants' requests for rescission and restitution. The parties agree that the defendants may only potentially recover these damages if NJC is first returned to the position it was in prior to executing the contract. According to NJC, this is impossible since CMS failed,

causing NJC to spiral into financial ruin. Once again, this is an attempt to obtain partial summary judgment masquerading as a motion seeking a pretrial evidentiary ruling.

The court also cannot resolve the motion based on the present record. "Restoration of the status quo requires the rescinding party to return any consideration it received from the other party under the contract." *23-25 Bldg. Partnership v. Testa Produce, Inc.,* 381 Ill.App.3d 751, 757 (1st Dist. 2008). The defendants contend that NJC's consideration was the use of its property, and that NJC has already gotten this back since it took back possession of its property and sold it. NJC has not weighed in on what consideration it provided to the defendants. NJC's motion in limine relating to rescission is thus denied without prejudice. The court strongly urges the parties to attempt to resolve this issue themselves in light of the guidance in this order.

To sum up, NJC's motion to bar evidence relating to damages [#162] is denied as to the breach of contract, unjust enrichment, and breach of fiduciary duty counterclaims, granted as to the fraud counterclaim, and denied without prejudice as to the counterclaim seeking rescission.

### D. The "Best Reasonable Efforts" Clause in Ganassi's Guaranty

NJC's sole claim directly against Mr. Ganassi is for breach of his guaranty of CMS's obligations under CMS's lease with NJC. Specifically, Mr. Ganassi guaranteed the payment to NJC of "fifty (50%) percent of funds borrowed to make Landlord Improvements as set forth in Section 8(a) of the above and foregoing lease, but limited to a maximum personal guaranty of $22,500,000.00." The guaranty also stated that "National Jockey Club and Chicago Motor Speedway, LLC agree to use their best reasonable efforts to remove and vacate the requirement for the personal guaranty of Chip Ganassi as soon as acceptable to the lender(s) of the aforesaid

primary financing for Landlord Improvements for which Chip Ganassi provides his personal guaranty."

The defendants contend that NJC breached the "best reasonable efforts" clause and that NJC's breach relieves Mr. Ganassi of any further obligations under the guaranty, entitles him to damages and/or entitles him to certain offsets against any amount he is found to owe on the guaranty. NJC, on the other hand, contends that all evidence relating to the best efforts clause should be excluded because such clauses are too vague to be enforceable under Illinois law.

Contrary to NJC's argument, "Illinois courts have not categorically rejected best efforts clauses as vague and unenforceable." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). Instead, these clauses are unenforceable only if "the parties so indefinitely expressed their intentions that the court cannot enforce their agreement." *Id*. at 1440-41; *see also Clever Ideas, Inc. v. Citicorp Diners Club, Inc.*, No. 02 C 5096, 2003 WL 21982141, at *15-18 (N.D. Ill. Aug. 20, 2003) (collecting cases). The court finds that the best efforts clause here is enforceable and provides a sufficient basis for imposing contractual duties on NJC because it sufficiently articulates NJC's obligation to act to achieve the goal specified in the contract. Thus, NJC's motion to bar testimony and evidence relating to the best efforts clause [#166] is denied.

### E.     Paul Pocalyko

Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony in federal court. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006).

Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In turn, under *Daubert*, this court must function as a "gatekeeper" to "ensure the reliability and relevancy of expert testimony." *Id*. at 607, *quoting Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). To perform the gatekeeping function, the court must focus on the expert's methodology, *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000), and consider whether the expert's work is "reasoned, uses the methods of the discipline, and is founded on data," *Naeem*, 444 F.3d at 608, *quoting Lang v. Kohl's Food Stores, Inc*., 217 F.3d 919, 924 (7th Cir. 2000). The court must also determine if an expert is offering legal conclusions, as "experts cannot make those." *See United States v. Diekhoff*, 535 F.3d 611, 619 (7th Cir. 2008).

Mr. Pocalyko's report states that he was retained and his work on this matter was designed to address the following issues:

> Whether the books and records of CMS were properly prepared and accurately stated within the context of the Limited Liability Company Operating Agreement dated July 8, 1998 (the "Operating Agreement") and the Lease. If not, we were asked to restate the books and records of CMS to properly reflect the financial position of the company.

> Whether the partner funding analysis prepared by NJC in connection with its claims was accurate and consistent with the terms of the Operating Agreement

and the Lease. If not, we were asked to perform our own alternative analysis of the funding status.

Evaluate NJC's claims with respect to the payments on the Harris bank loan, including amounts paid by the parties over time and the relationship of those payments to the guaranty provided by Ganassi.

NJC contends that Mr. Pocalyko offered a number of legal conclusions during discovery that are outside the scope of these subjects and asks the court to bar him from testifying as to legal issues at trial. Specifically, NJC seeks to bar Mr. Pocalyko from testifying:

(1) about the meaning and/or effect of any language in the lease, operating agreement, guaranty or other agreements (for purposes of this motion in limine, the "Agreements");

(2) about the propriety of any accounting, allocations or other practices of NJC based on Mr. Pocalycko's interpretation as to the meaning or effect of any language in the Agreements;

(3) that any payments made by or on behalf of Mr. Ganassi towards the CMS project should be applied to reduce the guaranty;

(4) that any allocations, calculations, credits, debits or other accounting matters should operate as "offsets" against any amounts owed by Mr. Ganassi under the guaranty; and

(5) that any accounting or other actions by NJC were "fraudulent," "wrongful," done with the "intent to deceive" or otherwise ascribe a motive or intent to any actions by NJC or its personnel.

In response, the defendants assert that Mr. Pocalyko's opinions about accounting issues will assist the trier of fact (an issue which NJC does not dispute). They also contend that NJC's motion is premature since Mr. Pocalyko has not yet testified. This is true, but not dispositive: if this was grounds for automatic denial of a motion in limine, this order would be far shorter. Next, they argue that Mr. Pocalyko is allowed to refer generally to legal concepts (*e.g.*, the existence of the guaranty) when offering opinions about accounting issues. Again, assuming that

Mr. Pocalyko in fact confines his testimony to accounting issues (*e.g.*, generally accepted accounting principles or the custom and practice in the industry), this is not disputed.

In the interests of avoiding lengthy sidebars during trial, the court offers the parties the following guidance: Mr. Pocalyko may not offer legal opinions at trial. This means that he may testify about areas within the scope of his expertise as an accountant. He may not, however, opine about the meaning and/or legal effect of any language in the Agreements or the propriety of any accounting, allocations or other practices of NJC based on his interpretation of the meaning or effect of any language in the Agreements (although he may testify about the propriety of these actions based on generally accepted accounting principles). He also may not opine that any accounting or other actions by NJC was "fraudulent," "wrongful," or done with the "intent to deceive" as the intent of the parties must be determined by the jury, and expert opinion testimony is not necessary on this point.

With respect to testimony that any payments made by or on behalf of Mr. Ganassi towards the CMS project should be applied to reduce the guaranty or that any allocations, calculations, credits, debits or other accounting matters should operate as "offsets" against any amounts owed by Mr. Ganassi under the guaranty, Mr. Pocalyko may only opine based on generally accepted accounting principles, and may not opine as to the legal effect of the language in the Agreements. This relief largely tracks that requested by NJC in its motion to bar certain opinions and testimony of Paul Pocalyko [#169], so to the extent specified in this order, that motion is granted.

## F.    Charles A. Gottschalk

Mr. Gottschalk is a fact witness for the defendants about the accounting issues at the heart of this case, as well as the Ganassi Group's Rule 30(b)(6) witness.  The disputed aspect of his testimony is due to the fact that the defendants also want him to wear the hat of an expert and testify as such at trial.  *See* Docket No. 197 ("Mr. Gottschalk's Report contains testimony and opinions that will be offered in both a lay witness and expert witness capacity").  NJC contends that Mr. Gottschalk should be limited to testifying as a fact witness because he was not properly designated as an expert, his report fails to satisfy Rule 26(a)(2) and his opinions are cumulative to those of Mr. Pocalyko, the defendants' accounting expert.  Alternatively, NJC argues that Mr. Gottschalk lacks the necessary expertise to provide an expert opinion, failed to properly support certain opinions, and that certain aspects of his opinion consist of impermissible legal conclusions.

The court begins with the basic proposition that Mr. Gottschalk is a lay witness who may provide certain opinion testimony pursuant to Rule 701.  Thus, he may testify about opinions or inferences if they are "(a) rationally based on [his] perception . . . , (b) helpful to a clear understanding of [his] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  The defendants appear to believe that because Mr. Gottschalk is a CPA, he is substantively interchangeable with their retained accounting expert, Mr.  Pocalyko, and may testify about the same range of areas as Mr. Pocalyko, but this is incorrect.

Because Mr. Gottschalk is not a retained witness and will be testifying due to his firsthand knowledge of relevant events, he did not have to submit an expert report.  See Fed. R.

Civ. P. 26(a)(2)(B) (a "disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness"). The court thus need not consider whether his report satisfies Rule 26(a)(2), as that rule is inapplicable.

As with the motion in limine to bar portions of Mr. Pocalyko's testimony, the court offers the following guidance to the parties. As discussed in detail above, the defendants should ensure that Mr. Gottschalk refrains from offering any legal opinions.[5] The court also rejects the defendants' contention that Mr. Gottschalk's opinions about the interpretation of the contract and whether it was breached, and whether the lease was wrongfully terminated "are not legal conclusions, but instead represent Mr. Gottschalk's personal opinion as to the effect of NJC's conduct on CMS's finances and financial viability." Docket No. 209 at 5. These are classic legal opinions, and thus are outside the scope of testimony offered by a fact witness who is an accountant.

In addition, Mr. Gottschalk may testify as a fact witness and, as applicable, a lay opinion witness based on matters that are "rationally based on [his] perception" and based on his own experience. To the extent that this includes any testimony from the perspective of an accountant, the court will not allow the defendants to offer cumulative or overlapping testimony on

_____

[5] Examples of impermissible legal opinions are Mr. Gottschalk's conclusions that: (1) CMS's books and records, which were prepared by NJC, are inaccurate because NJC's "interpretation of the lease and operating Agreement is not correct" (Gottschalk Report at 3); (2) the defendants "satisfied all of their obligations" under the lease and operating agreement (*id*. at 4); (3) NJC's termination of the lease was "wrongful" and "the termination was a material breach" of the lease and guaranty (*id*. at 4); (4) "The termination of the Lease was a material and important breach" of contract (*id*. at 5).

accounting matters from the perspective of an accountant via Mr. Pocalyko and Mr. Gottschalk. Mr. Gottschalk may also not parrot Mr. Pocalyko's opinions or vouch for him. *See id*. at 4 ( NJC "misappropriated large amounts of monies from CMS" as detailed in Mr. Pocalyko's report, with which Mr. Gottschalk agrees"); *id*. at 5 (the work, reports, analysis, and conclusions prepared by Mr. Pocalyko are correct).

With respect to NJC's contention that Mr. Gottschalk failed to properly support certain opinions, NJC had the opportunity to depose Mr. Gottschalk and may explore these alleged deficiencies via cross-examination. Thus, the court declines to bar testimony based on its purported lack of support.

Finally, NJC seeks to bar the defendants from referring to Mr. Gottschalk at trial as an expert. As noted by NJC, this case is not lacking for accountants, as each side has retained accountants as well as an accountant who was involved in the CMS project. Mr. Gottschalk (as well as NJC's fact witness accountant) need to be treated equally. In addition, it will prejudice NJC to cloak Mr. Gottschalk in the mantle of an expert at trial, thereby potentially causing the jury to believe that his testimony is more reliable and credible than that of a non-expert. Accordingly, NJC's motion to bar the defendants from referring to Mr. Gottschalk at trial as an expert is granted.

The court also notes that there appears to be a dispute about the defendants' use of the so-called "expert report" prepared by Mr. Gottschalk. The defendants do not state whether they in fact intend to use it at trial, as they simply assert that the report was meant to "outline all of his anticipated opinions and testimony at trial." *See* Docket No. 197 at 2. The defendants may not

use the report, for the reasons set forth above, and instead may simply offer Mr. Gottschalk's testimony at trial consistent with the limitations in this order.

Thus, NJC's motion to bar the report and opinions of Charles A. Gottschalk [#172] is granted in part and denied in part as detailed above.

### III.   Ganassi and Ganassi Group's Motions in Limine

Virtually all of the defendants' motions in limine seek rulings about the meaning of various contracts between the parties and thus would have been more properly presented in motions for partial summary judgment. Clarification of these issues at an earlier point may well have allowed the parties to tailor the pretrial order more appropriately. Nevertheless, the court will rule on the motions presently before it in an effort to narrow the issues for trial.

### A.   No. 1 – Parol Evidence of a Responsibility to Pay Construction Cost Overruns

The defendants contend that the operating agreement between NJC and the Ganassi Group and the lease between NJC and CMS require CMS (the tenant under the lease) to pay for any construction cost overruns associated with the project, so the Ganassi defendants cannot be liable for any cost overruns as a matter of law. Although the term "construction cost overrun" does not appear in the operating agreement or lease, the defendants contend that the concept of a construction cost overrun is "very simple" and that this consists of money taken by NJC from CMS to pay for costs incurred for construction of the project that exceeded the construction loan agreement between NJC and Harris Bank.

There are several problems with this line of reasoning. First, while the defendants vigorously champion strict construction of the language in the operating agreement and lease, the

language in those documents does not explicitly state that the Ganassi Group is not responsible for construction cost overruns, as that term is defined by the defendants today. Indeed, it does not directly address these costs.

Second, the defendants concede that the "Ganassi Group was responsible for 50% of the costs assessed to CMS." Docket No. 153 at ¶ 6. Thus, any costs assessed to CMS would be split between CMS and the Ganassi Group. This means that the Ganassi Group cannot divorce itself from partial responsibility for costs payable by CMS, since those costs would, by definition, also be partially payable by the Ganassi Group.

The court also notes that CMS, as the tenant under the lease, was responsible for paying for "all amounts of principal and interest and related charges due on funds borrowed by Landlord [NJC] to make the Landlord improvements as set forth in Section 8(a) below." Lease at ¶ 3(b)(I). Section 8(a) of the lease then states that "Landlord [NJC] will be responsible for the cost of the construction at the Premises of a first-class motor sports and horse racing venue . . . " *Id*. at ¶ 8(a). Thus, the contract provides that CMS and the Ganassi Group were responsible for splitting the cost of the loan payments for the construction *and* that NJC is responsible for the cost of the construction.

The court agrees with NJC that this conflict renders the contract ambiguous as to who was in fact contractually obligated to pay for construction costs. Accordingly, parol evidence is admissible to aid the trier of fact in determining the parties' intent. *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (internal citations omitted) (if "the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present. Only then may parol evidence be admitted to aid the trier of fact in

resolving the ambiguity").  This means that the defendants' motion, seeking a ruling that they are not responsible for construction cost overruns (however that term may ultimately be defined) and exclusion of parol evidence regarding cost overruns [#153] must be denied.

**B.      Nos. 2 & 3 – Effect of the Eighth Amendment on the Original Personal Guaranty**

NJC and a group of banks entered into the "Eighth Amendment, Waiver and Consent to Construction Loan Agreement."  The Eighth Amendment states that the signators' consent to the "reduction [of] the guaranty of the Lease by the Guarantor to $10,500,000."  Eighth Amendment at § 1.  A "Guarantor's Consent" signed by Chip Ganassi is attached to the Eighth Amendment. In that consent, Mr. Ganassi "confirms that his guaranty of the Lease and all of its obligations thereunder remain in full force and effect to the extent of $10,500,00."  Mr. Ganassi's original guaranty provided that Mr. Ganassi would personally guarantee one half of the primary debt for the project, to a maximum of $22,500,000.  As noted above, the guaranty itself does not provide any guidance on what is necessary to diminish the amount owed under the guaranty or extinguish it entirely.

The defendants' second and third motions in limine both relate to the effect of the Eighth Amendment on the guaranty.  Specifically, the defendants assert that the Eighth Amendment is inadmissible parol evidence of the amount of Mr. Ganassi's obligation under the guaranty and does not modify or amend the original guaranty signed by Mr. Ganassi.  NJC, on the other hand, contends that the Eighth Amendment is admissible and that it intends to use this document to show that the payment memorialized in the Eighth Amendment is the only payment that reduced the amount of the guaranty.

### a.      Is the Eighth Amendment Inadmissible Parol Evidence?

The defendants appear to be contending that they anticipate that NJC will offer the Eighth Amendment to increase the amount of the original guaranty (which had a cap of $22,500,000) by adding an additional guaranty in the amount of $10,500,000.  The defendants then argue that the Eighth Amendment is inadmissible parol evidence to the extent that NJC seeks to use it to modify the original guaranty.  The court has carefully read NJC's response.  It does not appear that NJC is attempting to introduce the Eighth Amendment for this purpose, especially given that they note that the purpose of the amendment was to reduce the guaranty amount to $10,500,000.  Thus, the defendants' motion is unnecessary.

In addition, to the extent that the defendants seek to bar introduction of the Eighth Amendment in its entirety as parol evidence, that position is incorrect.  Under Illinois law, "the parol evidence rule generally excludes evidence of prior agreements or contemporaneous oral agreements if the evidence is introduced to vary or contradict the terms of a written contract." *IFC Credit Corp. v. Burton Industries, Inc.*, 536 F.3d 610, 614 (7th Cir. 2008).  The rule, however, "does not bar contemporaneous written documents" or documents "executed at different times as parts of the same transaction[,]" even if the contract at issue is integrated.  *Id*., *quoting McDonald's Corp. v. Butler Co.*, 158 Ill.App.3d 902, 908-09 (2d Dist. 1987).

Moreover, Illinois law permits parties to a contract to modify that contract.  *See, e.g., Schwinder v. Austin Bank of Chicago*, 348 Ill.App.3d 461, 468 (1st Dist. 2004).  Thus, the parties may use the Eighth Amendment to show that the original guaranty amount was reduced, as specified in the Eighth Amendment.

Last, and certainly not least, the guaranty itself is silent as to what payments will in fact serve to reduce or eliminate Mr. Ganassi's obligation to pay under the guaranty in the event of a default by NJC. In light of this silence, the jury may consider evidence (including the Eighth Amendment and other evidence discussed below) that illuminates this critical point. *See Krueger Intern., Inc. v. Blank*, 225 F.3d 806, 814 (7th Cir. 2000) (where contract was silent regarding what was necessary to allow an entity to exercise a repurchase option, consideration of extrinsic evidence to clarify how and when options are exercised and exploration of "the parties' conduct or prior understanding might yield some insight into whether [the entity's] actions sufficed to exercise its option").

In short, the purpose of the defendants' second motion in limine is unclear, but the court disagrees with the defendants' apparent contention that the parol evidence rule prevents the Eighth Amendment from being admitted for any purpose. The defendants' second motion in limine [#154] is, therefore, denied.

### b. Does the Eighth Amendment Modify or Amend the Original Guaranty?

The defendants' third motion in limine rests on the same assumption as their second motion: that NJC contends that the Eighth Amendment increased Mr. Ganassi's total guaranty to $22,500,000 (the original guaranty amount) plus an additional $10,5000,000 (the guaranty provided for in the Eighth Amendment). NJC expressly rejects this characterization of its position, *see* Docket No. 186 at 2-3, so there is no need to address the defendants' argument that the Eighth Amendment does not increase the guaranty amount to $22,500,000 + $10,500,000.

The crux of the dispute regarding the Eighth Amendment appears to flow from the parties' disagreement regarding the existence and amount of payments made by Mr. Ganassi to reduce his obligations under the guaranty (which began with a cap of $22,500,000 and was later reduced to a cap of $10,500,000). This point must be determined at trial. As with the defendants' second motion in limine, however, the court declines to find that the Eighth Amendment is inadmissible. Accordingly, the defendants' third motion in limine [#155] is denied.

### C.      No. 9 – George Lalich

The court will jump to the defendants' ninth motion in limine as it is related to the defendants' fourth motion in limine, and it will be more helpful to rule on the arguments in the ninth motion before resuming consideration of the defendants' motions in numerical order. The defendants seek to bar George Lalich from testifying. Mr. Lalich is NJC's attorney and participated in the negotiation and drafting of the lease, operating agreement and loan agreement. NJC represents that he was also actively involved in the CMS project, including discussions about the Eighth Amendment and the reduction of Mr. Ganassi's guaranty.

NJC states that it intends to offer Mr. Lalich's testimony regarding the negotiation and drafting of the guaranty. NJC also contends that statements made by Mr. Ganassi regarding the guaranty are admissible as statements of a party opponent. Next, it argues that if the court finds that the guaranty is ambiguous, Mr. Lalich may testify about the circumstances surrounding the execution of the documents.

Because the guaranty does not explicitly state what kinds of payments reduce Mr. Ganassi's obligations under the guaranty, consideration of extrinsic evidence on this point is

admissible.  *See Krueger Intern., Inc. v. Blank*, 225 F.3d at 814.  The court also notes that Mr.

Ganassi cannot have it both ways:  if he plans to argue that he intended all of his cash

contributions to reduce his obligation under the guaranty, he cannot simultaneously assert that

NJC may not present evidence regarding its intent as to payments under the guaranty.

The court thus agrees with NJC that Mr. Lalich may testify about his involvement in the

negotiation, execution, and drafting of the guaranty and related documents and any discussions

with Mr. Ganassi or his representatives about the guaranty.  Accordingly, the defendants' ninth

motion in limine [#180] is denied.

### D.     Nos. 4, 5, & 6 – Testimony About the Eighth Amendment

The defendants' fourth motion in limine seeks to bar the "opinions" of Jeffrey Kras, a

30(b)(6) witness for NJC, and George Lalich, NJC's attorney, regarding the Eighth Amendment.

Mr. Kras was in charge of accounting for NJC and the CMS project.  As noted above, Mr. Lalich

was NJC's attorney and, according to NJC, was involved in the negotiation and drafting of the

original guaranty, lease and operating agreement as well as discussions about the Eighth

Amendment and the reduction of Mr. Ganassi's guaranty that was ultimately memorialized in the

Eighth Amendment.  In turn, the defendants' fifth and sixth motions in limine seek to bar the

testimony of Lana Powers.  Ms. Powers is a Vice-President of Harris Bank, and worked on

NJC's loan when it was in default.

The defendants contend that Mr. Kras, Mr. Lalich, and Ms. Powers should be barred from

"interpreting or providing opinions" regarding the effect of the Eighth Amendment and any

payments made on the guaranty.  The defendants essentially contend that these witnesses should

not testify because they have no personal knowledge of the Eighth Amendment.  Alternatively,

the defendants assert that the witnesses lack foundation to provide interpretations and opinions regarding the Eighth Amendment.

The court has already ruled that Mr. Lalich may testify as to certain matters relating to documents at issue in this case. While this court lacks a crystal ball and thus cannot predict what will happen at trial, it is difficult to see how Mr. Lalich could lack any personal knowledge whatsoever about the Eighth Amendment. With respect to the remaining issues in the defendants' motions, challenges to foundation are best left for trial when they can be resolved in the context of that witnesses' testimony and the other evidence presented. *Carlson v. Bukovic*, 07 C 06, No. 2009 WL 1286004, at *1 (N.D. Ill. May 4, 2009). Accordingly, these motions are denied without prejudice to raising them at trial.

### E.    No. 7 – Shepard Pryor IV

Mr. Ganassi's position is that payments made pursuant to the construction loan agreement extinguished any monies owed under the guaranty (*i.e.*, that guaranty essentially was a note that was reduced by cash contributions made by Mr. Ganassi to the CMS project). The reader may recall that the guaranty states that the lending banks were the intended beneficiaries of the guaranty, and the banks negotiated and were parties to the Eighth Amendment, which modified the amount owed under the guaranty as discussed above. To respond to Mr. Ganassi's argument that certain payments extinguished his obligations under the guaranty, NJC retained Shepard Pryor, a professional banker with extensive experience dealing with loans and guaranties as an officer and a consultant to banks and financial institutions.

Mr. Pryor has opined that the only payment that reduced the amount of Mr. Ganassi's personal guaranty was the payment made pursuant to the Eighth Amendment. Mr. Ganassi

contends that Mr. Pryor should be barred from testifying because his opinions are "wrong," he lacks a proper basis to offer an expert opinion, he cannot opine about Harris Bank's intent regarding the construction loan, and Mr. Pryor's testimony about the customs and practices in the banking industry are irrelevant. *See* Docket No. 165 at 3.

The court finds that Mr. Pryor – who has extensive experience in the relevant field – is qualified under *Daubert* to offer the analysis and opinions disclosed in his report. It further finds that these opinions about customary banking practices relating to guaranties are relevant and will assist the jury. These opinions shed light on the custom and practice in the banking industry and the expectations that Mr. Pryor believes that banking industry professionals would have after reading Mr. Ganassi's guaranty and the Eighth Amendment with respect to payments under the guaranty, and thus are not legal conclusions.

To the extent that Mr. Ganassi disagrees with Mr. Pryor's conclusions, that goes to the weight of Mr. Pryor's testimony, not its admissibility. Finally, the court agrees with NJC that Mr. Ganassi's position regarding the guaranty necessitated retention of an expert with the kind of expertise that Mr. Pryor can offer. The finder of fact will have to decide the ultimate issue of how much, if anything, Mr. Ganassi currently owes under the guaranty, but Mr. Ganassi's position that the guaranty essentially acted as a note makes Mr. Pryor's testimony relevant and helpful in deciding whether to accept that position. Accordingly, the defendants' motion to bar Mr. Pryor's testimony [#164] is denied.

### F.    Nos. 8 & 10 – Undisclosed Testimony

In their eighth motion in limine, the defendants ask that the court "bar any undisclosed opinions regarding payments made by Chip Ganassi to reduce the personal guarantee [sic] at

issue." In their tenth motion in limine, they ask the court to "bar any undisclosed testimony regarding termination of the lease." The defendants then go on to name several witnesses, including Jeffrey Kras, Laura Conlon, James McGovern, Jeffrey Kras, Patricia Bidwell, and Charles Bidwell, and argue that because they did not testify in their depositions to any amounts that may have reduced Mr. Ganassi's personal guaranty or offer any "opinions" regarding termination of the lease, any such testimony at trial should be barred. The defendants also assert that this testimony should be barred because these witnesses were not disclosed pursuant to Rule 26(a) as having any knowledge of the relevant issue.

The defendants, however, do not point to any authority that a witness cannot testify to topics that were not raised at his or her deposition or that were not specifically disclosed in a Rule 26(a) filing. Accordingly, motion in limine nos. eight and ten are denied without prejudice. To the extent that the defendants believe that other objections to this testimony are appropriate at trial, they may raise the issue then and the court will rule at that time in the context of the trial.

### G.    No. 11 – Discussions With Illinois Officials

In their eleventh motion in limine, the defendants seek to preclude NJC from "introducing hearsay discussions with Illinois officials." The defendants specifically refer to conversations between NJC's Jeffrey Kras and officials at the Illinois Racing Board and the Department of Commerce and Community Affairs. The defendants are essentially asking the court to rule in limine that it will enforce the Federal Rules of Evidence at trial. Should the defendants interpose a hearsay objection to a particular witness' testimony at trial, the court will rule on that objection in the context of trial. Thus, this motion in limine [#174] is denied without prejudice.

**H.     No. 13 – James L. McGovern**

Next, the defendants ask the court to bar testimony by NJC's rebuttal expert, James L. McGovern, asserting that NJC disclosed him after the deadline to do so had passed.  The defendants approach timeliness from two different angles.  First, they note that they twice agreed to extend the deadline for NJC to identify its rebuttal expert but declined to agree to a third extension because, they state, it would have disrupted the court's pre-trial and trial schedule.  Magistrate Judge Nolan granted NJC's motion for a third extension over the defendants' objection and instructed the defendants to file any objections to the rebuttal testimony prior to trial as a motion in limine.

Given that Magistrate Judge Nolan granted NJC's motion for an extension of time, NJC's disclosure of Mr. McGovern as a rebuttal expert appears to have been timely.  This brings the court to the defendants' second timeliness attack on Mr. McGovern:  that NJC was required to disclose him by the deadline to disclose its experts because he is not a proper rebuttal expert.  In support, the defendants assert that Mr. McGovern's report is "riddled with non-rebuttal opinions which extended beyond Ganassi's expert report prepared by Parente Randolph, LLC."  The defendants then find fault with Mr. McGovern's report, arguing that he "opined on issues that NJC was aware of well before Ganassi's expert report was due."  Specifically, the defendants assert that McGovern should not be allowed to opine as to real estate taxes, salaries and benefits, construction costs, and conversion costs, because the defendants discussed in detail their theories of recovery and claims concerning these topics in their Third Supplemental Answers to NJC's interrogatories.  Thus, the defendants conclude that "NJC should have presented an expert on these issues prior to the expert disclosure deadline of 10/15/2008."

As an initial matter, the court agrees with NJC that it was not obligated to disclose its own expert based on theories presented in the defendants' response to interrogatories. The defendants have alleged counterclaims and it is their burden to establish the elements of those counterclaims through, in part, expert testimony. NJC is entitled to retain a rebuttal expert to rebut the defendants' experts' opinions. In other words, NJC was not obligated to hire an expert before the defendants' expert had submitted his report based on its prognostications as to how the defendants might seek to support their claims using expert testimony. The request to bar Mr. McGovern because he should have been disclosed as an expert witness for NJC, as opposed to a rebuttal expert, is thus denied.

This leaves the defendants's claim that certain of Mr. McGovern's opinions go beyond proper rebuttal testimony. The defendants do not identify the specific sections of Mr. McGovern's report that allegedly are outside the scope of rebuttal testimony. In addition, based on the present record, the court cannot ascertain how, if at all, Mr. McGovern's opinions match up to the defendants' expert report(s). Thus, this portion of the defendants' motion to bar Mr. McGovern [#158] is denied without prejudice to renewal at trial.

## I.       No. 14 – Standing in Water as Deep as You

The defendants seek to bar NJC's witnesses from testifying that Chip Ganassi told them that he was "standing in water as deep as you" (or a variation of this phrase) with respect to his obligations and commitments to the CMS project. Examples of this statement are Mr. Ganassi's testimony at his deposition that he said something "to the effect that he wanted to stand in depths of water no greater or less than Charlie Bidwell" and his letter to NJC in May of 2002 stating that, "I have always stated I am glad to stand in water as deep as my partner."

First, the defendants assert that NJC's contention that CMS's costs and expenses were to be split 50/50 between NJC and the defendants arose in the context of NJC's claims for breach of fiduciary duty and promissory estoppel, which NJC dismissed with prejudice. The defendants then reason that the "standing in water" evidence has no bearing on NJC's remaining claim for breach of the guaranty. However, as NJC notes, the statement feasibly could be relevant to the defendants' counterclaim for fraud, in that NJC may seek to rely on the statement in order to demonstrate why it made certain accounting or other business related decisions to allocate CMS costs on a 50/50 basis.

The defendants next argue that the statement is parol evidence that conflicts with the operating agreement, which according to the defendants, definitively shows that the Ganassi Group was only obligated to make a capital contribution of $125,000 and was not liable for any other costs associated with CMS. This is, of course, one of the main issues that will be tried. The fact that the statement could be interpreted to contravene a written agreement does not automatically provide a basis for excluding it, as the parol evidence rule does not reach each and every oral or written statement that addresses the same subject of a written agreement. *See, e.g., Fischer v. First Chicago Capital Markets, Inc.*, 195 F.3d 279, 282-83 (7th Cir. 1999) ("the parol evidence rule applies only to agreements made prior to or contemporaneous with the signing of a written contract; it does not bar evidence tending to show later modifications of the contract"). Similarly, to the extent that NJC intends to use the "standing in water" evidence in connection with an issue other than the meaning of the operating agreement, such as the reason why NJC allocated expenses as it did, it is admissible. *See, e.g., Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 722 (7th Cir. 2003) (an asset purchase agreement was not parol evidence because it

was offered for a purpose other than shedding light on the meaning of a prior contract). In short, whether or not the statement constitutes inadmissible parol evidence must be decided within the context of the testimony in which it is being elicited. Accordingly, the defendants' request for a wholesale bar of any reference to the "standing in water" statements is denied without prejudice to renewal at trial.

## IV. Conclusion

The following motions in limine are denied:

(1) The defendants' motion in limine no. 1 to preclude parol evidence of a responsibility to pay construction cost overruns [#153];

(2) The defendants' motion in limine no. 2 to bar the eighth amendment as inadmissible parol evidence of the amount of Mr. Ganassi's obligation under the guaranty [#154];

(3) The defendants' motion in limine no. 3 to preclude plaintiff from arguing that the eighth amendment modifies or amends the personal guaranty agreement [#155];

(4) NJC's motion in limine seeking to bar the defendants from presenting any evidence of damages or setoffs other than their claim for the return of their $28 million investment in the Chicago Motor Speedway Joint Venture [#160];

(5) The defendants' motion in limine no. 7 to bar the opinions of Shepard Pryor IV [#164];

(6) NJC's motion to bar testimony and evidence relating to the best efforts clause [#166];

(7) The defendants' motion in limine no. 12 to preclude NJC's claim under the guaranty based on lack of standing [#175]; and

(8) The defendants' motion in limine no. 9 to bar testimony of George Lalich[#180].

The following motions in limine are denied without prejudice:

(1)     The defendants' motion in limine no. 5 to preclude Lana Powers from interpreting, or providing opinions regarding, the effect of the eighth amendment [#156];

(2)     The defendants' motion in limine no. 6 to preclude testimony or opinions of Lana Powers regarding the effect of payment on the guaranty [#161];

(3)     NJC's motion to bar any evidence or testimony as to the sale of the Harris Bank note and the beneficiaries and/or recipients of the proceeds of any judgment entered in favor of NJC [#167];

(4)     The defendants' motion in limine no. 8 to bar any undisclosed opinions regarding payments to reduce the guaranty [#168];

(5)     The defendants' motion in limine no. 10 to bar any undisclosed testimony regarding termination of the lease [#173];

(6)     The defendants' motion in limine no. 11 to preclude hearsay discussions with Illinois officials [#174];

(7)     The defendants' motion in limine no. 14 to bar any testimony regarding standing in water as deep as you [#176]; and

(8)     The defendants' motion in limine no. 4 to bar opinions of Jeffrey Kras and George Lalich regarding the eighth amendment to the construction loan agreement [#178].

The following motions in limine are resolved as follows:

(1)     NJC's motion in limine to bar evidence relating to a claim that NJC converted monies [#157] is granted to the extent that the defendants may not argue or present evidence to further the theory that NJC is liable for the tort of conversion under Illinois law.  Consistent with the remainder of this order, however, the defendants may argue that NJC misappropriated money;

(2)     NJC's motion to bar evidence relating to damages [#162] is denied as to the breach of contract, unjust enrichment, and breach of fiduciary duty counterclaims, granted as to the fraud counterclaim, and denied without prejudice as to the counterclaim seeking rescission;

(3)     To the extent specified in this order, NJC's motion to bar certain opinions and testimony of Paul Pocalyko [#169] is granted;

(4)    NJC's motion to bar the report and opinions of Charles A. Gottschalk [#172] is
        granted in part and denied in part as detailed above; and

(5)    The defendants' motion no. 13 to bar Mr. McGovern [#158] is denied to the
        extent that the defendants argue that he was not disclosed in a timely manner, and
        denied without prejudice to the extent that the defendants argue that his testimony
        is outside the scope of a rebuttal expert.

The court thanks all counsel for their excellent and extremely helpful briefs in this

complex case.


DATE:   July 21, 2009                            _____
                                                 Blanche M. Manning
                                                 United States District Judge