## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NATIONAL JOCKEY CLUB, an Illinois )
corporation, )
             Plaintiff, )
 )
    v. )    Case No. 04 C 3743
 )    Hon. Judge Manning
FLOYD "CHIP" GANASSI and GANASSI )
GROUP, LLC, a limited liability )
company, )
 )
         Defendants. )

## FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
## RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants, FLOYD "CHIP" GANASSI and GANASSI GROUP, LLC ("Defendants") hereby move this Honorable Court to enter Judgment as a Matter of Law in their favor pursuant to Fed. R. Civ. P. 50(a) as to Count I of Plaintiff's Complaint. In support of this motion, Defendants state as follows:

## I.   INTRODUCTION

Plaintiff asserts only one claim in this matter: Breach of Guaranty against Chip Ganassi. *Plaintiff's Complaint*, Count I. Judgment as a matter of law is appropriate where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. Pro. 50(a). In this case, Defendants are entitled to judgment as a matter of law as to Count I of Plaintiff's Complaint for the following reasons:

1

(1) The uncontroverted evidence establishes that NJC wrongfully terminated the Lease, of which Mr. Ganassi's personal guaranty was part and parcel;

(2) NJC failed to establish any evidence that the underlying obligation of Mr. Ganassi's personal guaranty is due and owing;

(3) The uncontroverted evidence establishes that Mr. Ganassi satisfied his obligations under his personal guaranty; and

(4) The uncontroverted evidence establishes that the 8th Amendment to the Construction Loan Agreement does not comply with the Illinois Credit Agreements Act.

## II.  **THE LAW OF GUARANTIES**

Guaranty contracts are to be strictly construed in favor of the guarantor. *See*, *e.g.*, *Roth v. Dillavou*, 359 Ill.App.3d 1023, 1028 (2nd Dist. 2008); *Lincoln Park Fed. Savings and Loan Ass'n v. Carrane*, 192 Ill.App.3d 188, 191 (1st Dist. 1989); *Harris Trust & Sav. Bank v. Stephans*, 97 Ill.App.3d 683, 689 (1st Dist. 1981).

The guarantor's undertaking pursuant to the guaranty must be strictly construed, and his or her liability cannot be varied or extended beyond the precise terms of the guaranty. *McLean County Bank v. Brokaw*, 119 Ill.2d 405, 412 (Ill. Sup. Ct. 1988); *Emrick v. First Nat'l Bank of Jonesboro*, 324 Ill.App.3d 1109, 1114 (5th Dist. 2001); *Lincoln Park*, 192 Ill.App.3d at 191.

The guarantor is to be accorded the benefit of any doubt that may arise from the contract language. *A.D.E. Inc. v. Louis*

2

*Joliet Bank and Trust Co.*, 742 F.2d 395, 396 (7th Cir. 1984) (Judge Posner acknowledging that this is "well-established Illinois law"); *McLean County Bank*, 119 Ill.2d at 412; *Cohen v. Continental Illinois Nat. Bank & Trust Co. of Chicago*, 248 Ill.App.3d 188, 192 (1st Dist. 1993).

The law provides that the guarantor of a lease cannot be held liable, without his consent, for any of the obligations of the lessee incurred beyond the term of the lease. *T.C.T. Bldg. P'ship v. Tandy Corp.*, 323 Ill.App.3d 114, 118-19 (1st Dist. 2001); *McHenry State Bank v. Y & A Trucking, Inc.*, 117 Ill.App.3d 629, 633 (2nd Dist. 1983); *Kagan v. Gillett*, 269 Ill.App. 311 (1st Dist. 1933); *Irving Tanning Co. v. Am. Classic, Inc.*, 736 F.Supp. 161, 163 (N.D. Ill. 1990); *Essex Int'l, Inc. v. Clamage*, 440 F.2d 547, 550 (7th Cir. 1971); *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 886 (7th Cir. 2005); *Brzozowski v. Northern Trust Co.*, 248 Ill.App.3d 95, 101 (1st Dist. 1993).

The law further provides that no liability may be imposed on a guarantor unless and until the principal debtor has defaulted on its obligation. *Hensler v. Busey Bank*, 231 Ill.App.3d 920, 927 (4th Dist. 1992); *Peirce v. Conant*, 47 Ill.App.2d 294, 305 (1st Dist. 1964); *McHenry State Bank v. Y & A Trucking, Inc.*, 117 Ill.App.3d at 633; *Irving Tanning Co. v. Am. Classic, Inc.*, 736 F.Supp. at 163; *Essex Int'l, Inc. v. Clamage*,

440 F.2d at 550; *Brzozowski v. Northern Trust Co.*, 248 Ill.App.3d at 101.

Based on the evidence in this case, which must be construed in light of the foregoing legal principles, no reasonable jury would have a legally sufficient evidentiary basis to find for Plaintiff on its claim of breach of guaranty.

## III. ARGUMENT

### A. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW WHERE NJC WRONGFULLY TERMINATED THE LEASE, OF WHICH THE GUARANTY WAS PART AND PARCEL.

At the direction of Patricia Bidwill, NJC's attorney terminated the Lease between NJC and CMS on October 16, 2002. *See* Plaintiff's Exhibit 203 - 10/16/02 Letter from NJC's counsel terminating lease; Trial Transcript of P. Bidwill, p. 1094, lns. 11-14 (*Exhibit A*).

By its very terms, the Guaranty is part and parcel to the Lease. The Guaranty states:

> For value received, and as consideration and inducement for National Jockey Club to enter into the above and foregoing Lease with Chicago Motor Speedway, L.L.C., **of which this Personal Guaranty is a part**, the undersigned, Mr. Chip Ganassi of Pittsburgh, Pennsylvania, does hereby personally guaranty repayment of fifty (50%) percent of funds borrowed to make Landlord Improvements as set forth in Section 8(a) of the above and foregoing Lease, but limited to a maximum personal guaranty of $22,500,000.

*See* Plaintiff's Exhibit 28 - Lease and Guaranty.

4

Moreover, Charles Bidwill, President of NJC, confirmed in his trial testimony that the Guaranty was part of the Lease. Mr. Bidwill stated:

> **Q.** And as the president of National Jockey Club, you understood that the personal guaranty was expressly part of the lease, did you not?
>
> **A.** Yes.

Trial Transcript of C. Bidwill, p. 297, lns. 7-14 (*Exhibit B*).

★★★

> **Q.** Chip's Guaranty was given to NJC as part of the lease, right?
>
> **A.** Yes.

*Id.* at p. 308, lns. 8-10 (*Exhibit C*).

Neither the Lease nor the Guaranty attached thereto has any survival clause or language that would extend the Guaranty provision beyond termination of the Lease. *See* Plaintiff's Exhibit 28 – Lease and Guaranty. Mr. Bidwill admits that the Guaranty does not state that it is continuing:

> **Q.** There is no language in Chip's Guaranty, Exhibit 28, that it is a continuing guaranty, is there?
>
> **A.** Not that I remember, no.

Trial Transcript of C. Bidwill, p. 302, lns. 8-10 (*Exhibit D*).

★★★

> **Q.** There is no language in Mr. Ganassi's guaranty that indicates that the guaranty is of a continuing nature, is there?
>
> [objection]

5

**A.**	I do not see continuing.

*Id.* at pp. 303-304, lns. 25 – 6 (*Exhibit E*).

***

**Q.**	There's no other – certainly continuing, there is no language that is a continuing guaranty, but there's no other similar words as continuing in his guaranty.

**A.**	No.

*Id.* at p. 304, lns. 16-19 (*Exhibit F*).

Moreover, there has been no evidence submitted that Chip Ganassi in any way agreed to an extension of the Guaranty beyond termination of the Lease.

Notably, the 8th Amendment to the Construction Loan Agreement ("8th Amendment") is of no assistance to Plaintiff. The 8th Amendment was executed *before* the Lease was terminated. Thus, termination of the Lease terminated the Guaranty, whether it was amended or not. Furthermore, the 8th Amendment amended the Construction Loan Agreement, not the Lease.

Ms. Patricia Bidwill is the only NJC witness that has testified regarding the circumstances surrounding NJC's termination of the Lease. Ms. Bidwill admitted that at the time of NJC's termination of the Lease, CMS owed no "rent" – *i.e.* principal or interest payments on the Construction Loan. Ms. Bidwill testified as follows:

**Q.**	Okay. And at the time the lease was terminated, the bank had agreed to the Silverman plan?

6

**A.** Yes.

**Q.** And the bank had agreed that there would not be a principal payment due for some time to come?

**A.** I don't know the definition of "some time to come." They gave us some flexibility. I don't remember exactly when our first principal payment was due.

**Q.** All right. It certainly wasn't due on the date of the lease termination?

**A.** Right, correct.

**Q.** And the interest was also paid up on the date of the termination?

**A.** Yes.

Trial Transcript of P. Bidwill, pp. 1097-1098, lns. 23 - 11 (*Exhibit G*).

In fact, at the time of termination, the Ganassi side had paid substantially more rent than the NJC side. Ms. Bidwill testified:

**Q.** So wouldn't you agree ma'am, that at the time the lease was terminated, that the Ganassi side had paid a considerable, a lot more rent than the NJC side?

**A.** They had paid more rent in terms of principal and interest, yes, at that time, yes.

**Q.** A lot more?

**A.** A lot more, yes.

Trial Transcript of P. Bidwill, p. 1097, lns. 2-8 (*Exhibit H*).

Notably, at the time of termination the bank had not even called the note on the Construction Loan. Ms. Bidwill further testified:

> **Q.** At this juncture had Harris Bank called the loan for National Jockey Club?
>
> **A.** No.

Trial Transcript of P. Bidwill, p. 1083, lns. 1-3 (*Exhibit I*). Mr. Bidwill similarly testified as follows:

> **Q.** Do you recall the bank ever sending National Jockey Club a notice of default?
>
> **A.** No.

Trial Transcript of C. Bidwill, p. 428, lns. 4 - 6 (*Exhibit J*). This is because the principal and interest payments to the bank were current. Thus, CMS was not in default on its rent payments at the time of termination and NJC was not entitled to unilaterally terminate the Lease.

When NJC wrongfully terminated the Lease, it terminated all provisions of the Lease that were not subject to a survival clause. The Guaranty, which was part of the Lease, was not subject to a survival clause. Accordingly, when the Lease was terminated, so too was the Guaranty.

Furthermore, the law provides that the guarantor of a lease, Chip Ganassi, cannot be held liable, without his consent, for any of the obligations of the lessee, CMS, incurred beyond the term of the lease. *See* Section II, *supra*. NJC terminated

8

the lease with the lessee, CMS. There is no evidence in the record that Mr. Ganassi agreed at any time that the Guaranty would extend beyond termination of that Lease.

Consequently, Defendants are entitled to judgment as a matter of law on Plaintiff's breach of guaranty claim.

## B. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW WHERE PLAINTIFF HAS FAILED TO PROVE THAT CMS OWES ANY AMOUNT OF RENT UNDER THE LEASE.

The law provides that no liability may be imposed upon Chip Ganassi, the Guarantor, unless and until the principal debtor, CMS, has defaulted on its obligation. See Section II, supra. Accordingly, to collect on the Guaranty, NJC must prove that CMS owes "rent" under the Lease – i.e. a principal and/or interest payment on the Construction Loan.

The only evidence submitted is that Mr. Ganassi has paid a total of over $28 million dollars, $18.5 million of which is acknowledged debt payment. There is no evidence in the record as to what, if any, rent is currently due under the Lease, much less any evidence as to whether the amount is less than, equals or exceeds the $10.5 million that NJC contends is remaining on Mr. Ganassi's Guaranty.

As demonstrated above, at the time NJC terminated the Lease, CMS owed no principal or interest payments (rent) under the Lease. Despite that fact, NJC terminated the Lease with CMS. The only additional evidence submitted is that NJC sold

9

the track, that NJC continued to operate its horse racing business for four years after it terminated the Lease with CMS, that NJC is now in bankruptcy, and that Mr. Duchossois now owns the note. So what further obligation is there under the Lease, or under the note? There is simply no evidence in the record establishing any further obligation.

*Ex Parte Kaschak* is persuasive authority in this case. *Ex Parte Kaschak*, 681 So. 2d 197 (Sup. Ct. Ala. 1996). In *Ex Parte Kaschak*, the court held that termination of a commercial lease also terminated the liability of the guarantor for unpaid rent. The court noted that courts will look to the terms of the guaranty agreement to determine if something in the language obligates the guarantor beyond the termination of the lease between the principals. Where a guaranty agreement is unconditional, the liability of the guarantor will not exceed the liability of the principal debtor. *Id.* In order to be entitled to enforce the obligation of the contract of guaranty, the creditor must show that the guaranteed debt or obligation is due. *Id.* If for any reason the debtor is not bound to make payment to the creditor, then the creditor may not hold the guarantor liable. *Id.* A guarantor is liable only in the event and to the extent that the principal is liable. *Id.* A lessor can recover on an unconditional guaranty of a lease only by proving a claim against the lessee on the

underlying lease agreement. *Id.; see also Brywood Ltd. Partners, L.P. v. H.T.G., Inc.*, 866 S.W.2d 903 (Mo. App. 1993).

There is no evidence that there was or is any "rent" currently due and owing by CMS under the Lease for which Mr. Ganassi could be responsible as guarantor of CMS's obligations. Without evidence of an underlying obligation, Mr. Ganassi cannot be required to pay on the Guaranty and is entitled to judgment as a matter of law.

**C. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW WHERE CHIP GANASSI SATISFIED HIS OBLIGATION UNDER THE GUARANTY.**

Pursuant to the express terms of the Guaranty, Mr. Ganassi is responsible for a maximum of $22.5 million. The Guaranty states:

> For value received, and as consideration and inducement for National Jockey Club to enter into the above and foregoing Lease with Chicago Motor Speedway, L.L.C., of which this Personal Guaranty is a part, the undersigned, Mr. Chip Ganassi of Pittsburgh, Pennsylvania, does hereby personally guaranty repayment of fifty (50%) percent of funds borrowed to make Landlord Improvements as set forth in Section 8(a) of the above and foregoing Lease, **but limited to a maximum personal guaranty of $22,500,000.**

*See* Plaintiff's Exhibit 28 – Lease and Guaranty.

It is undisputed in this case that Mr. Ganassi has paid over $28 million. *See* Defendants' Exhibit 221B – CMS Partner

11

Fundings Through June 30, 2002.  Further, Mr. Kras, NJC's Chief Financial Officer, testified as follows:

> **Q.** Looking at Exhibit 221B, that is your accounting department's tracking of what Mr. Ganassi had paid into this project, is it not?
>
> **A.** This is what we credited Ganassi Group's contributions for, yes.
>
> **Q.** All right.  It's clear that you agree today that the total contribution was 28 million - 28 and a half million dollars?
>
> **A.** Yes.
>
> **Q.** And all of those payments, as far as you were concerned when you made this, were all legitimate, and there wasn't any controversy about that amount of money, was there?
>
> **A.** This was not prepared by me, but I relied on it and I believe it's factual and truthful.

Trial Transcript of J. Kras, p. 988, lns. 8-20 (*Exhibit K*).

There is no evidence that these monies did not originate from the pocket of Chip Ganassi.  Mr. Ganassi testified that this money, though it may have passed through the Ganassi Group, LLC entity, originated with and was caused to be paid by him personally.  Mr. Ganassi stated:

> **Q.** And when money was requested of Group, the money came from its members, correct?
>
> **A.** All the money that came, when Charlie would call me and say he, we need money, I sent him money.
>
> **Q.** And that money came from Group, which was a member of CMS?
>
> **A.** It came from wherever I had money.  Yes.

12

Trial Transcript of C. Ganassi, p. 1165, lns. 15-21 (*Exhibit L*).

No evidence has been submitted to refute this contention. In fact, NJC's witnesses claim either that Mr. Ganassi paid the money, that they understood Mr. Ganassi and Ganassi Group, LLC to be one and the same, or that they simply did not in fact know the source of funds being submitted from the Ganassi side.

NJC's President, Mr. Bidwill, testified as follows:

**Q.**   Sorry. Here's what happened. If CMS didn't have enough money, you had a good relationship with Chip Ganassi, did you not?

**A.**   Yes, sir.

**Q.**   And you would call him from time to time and say: Hey, Chip, we're short; can you send some money?

**A.**   Yes, sir.

**Q.**   And he did that by and large, didn't he?

**A.**   Yes, sir.

Trial Transcript of C. Bidwill, pp. 343-344, lns. 19 - 2 (*Exhibit M*).

***

**Q.**   And so you called Chip Ganassi and asked him for money, did you not?

**A.**   I'm sure a request was made to Mr. Ganassi or Ganassi Group, yes.

**Q.**   Well, you told us yesterday that you spoke to Chip to get that money, did you not?

**A.**   I'm sure I spoke to him.

**Q.** And somebody on behalf of Mr. Ganassi sent that money, didn't they?

**A.** Yes, sir, I believe so.

**Q.** And you as you sit here today don't know the source of that funds, do you?

**A.** No, sir.

**Q.** You don't know the source of any of the funds that Mr. Ganassi sent in, do you?

**A.** You mean from – I don't know what you mean by that.

**Q.** All right. You don't know out of what accounts the moneys came from. You never saw the check come in?

**A.** No, sir.

*Id.* at pp. 470-471, lns. 11 - 4 (*Exhibit N*).

Mr. Kras, NJC's Chief Financial Officer, testified as follows:

**Q.** Okay. So in total you'd agree that Chip Ganassi funded $18,750,000 of loan payments would you not?

**A.** I would agree that either Mr. Ganassi or Ganassi Group funded that amount, yes.

**Q.** I'm sorry, what did you say?

**A.** Either Mr. Ganassi or Ganassi Group funded that $18 million, yes.

**Q.** But you know that it was Chip Ganassi, don't you?

**A.** I would believe it's one and the same, but I don't know the nature of all the transactions.

Trial Transcript of J. Kras, p. 994, lns. 2-11 (*Exhibit O*).

14

The evidence in this case has established that Mr. Ganassi has paid well more than the maximum $22.5 million required of him under the Guaranty. Consequently, Mr. Ganassi satisfied his obligation under the Guaranty. Where the evidence establishes that Mr. Ganassi has satisfied any obligation that he had or has under the Guaranty, Plaintiff has failed to establish that Mr. Ganassi breached the Guaranty – a necessary element to Plaintiff's claim for breach of guaranty. As such, Defendants are entitled to a judgment as a matter of law.

### D. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW WHERE THE 8TH AMENDMENT DOES NOT COMPLY WITH THE ILLINOIS CREDIT AGREEMENTS ACT.

In this case, NJC sued Chip Ganassi for breach of a guaranty that was "part of" the Lease between NJC and CMS. *See Plaintiff's Complaint*, ¶ 33. To the extent NJC's claim against Mr. Ganassi is premised on the 8th Amendment to the Construction Loan Agreement ("8th Amendment"), which Defendants adamantly contend is improper, the Illinois Credit Agreements Act ("ICAA") bars NJC's claim.

Under the ICAA, a "credit agreement" is defined as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family or household purposes, and not in connection with the issuance of credit cards." 815 ILCS 160/1 (West 2009). The writing requirement of the ICAA provides:

15

> [a] debtor may not maintain an action on or in any way
> related to a credit agreement unless the credit
> agreement is in writing, expresses an agreement or
> commitment to lend money or extend credit or delay or
> forbear repayment of money, sets forth the relevant
> terms and conditions, **and is signed by the creditor
> and debtor.**

815 ILCS 160/2 (emphasis added).

The "ICAA is a broad statute that will be applied the way it was written, even though the results of that application may at times seem harsh." *Help at Home, Inc. v. Med. Capital, LLC*, 260 F.3d 748, 755 (7th Cir. 2001) (citations omitted). Courts have consistently held that "[t]he ICAA's writing requirement is a strong form of the statute of frauds. In particular, it requires the signatures of both parties; the signature of only one party renders the agreement unenforceable." *Id.* (citing *Resolution Trust Corp. v. Thompson*, 989 F.2d 942, 944 (7th Cir. 1993); *McAloon v. Northwest Bancorp., Inc.*, 274 Ill. App. 3d 758 (2d Dist. 1995)).

A guaranty contract is one of several documents constituting a credit agreement and cannot be considered independently. *Bank One, Springfield v. Roscetti*, 309 Ill.App.3d 1048, 1058 (4th Dist. 2000). For example, in *Bank One*, the court found a guaranty, together with a note and other documents, constituted the comprehensive credit agreement at issue. *Id.* The court held that the guarantor's defenses and

16

counterclaims violated the ICAA's prohibition of oral modifications to credit agreements. *Id.* at 1059.

In this case, NJC's only claim against Chip Ganassi pivots on its contention that the Guarantor's Consent to the 8th Amendment amends Mr. Ganassi's Guaranty, a position which Defendants have repeatedly argued is untenable for numerous reasons. One reason is that NJC's argument is prohibited as a matter of law where neither NJC nor the bank or its syndicates signed the Guarantor's Consent to the 8th Amendment as required by the ICAA.

Under the ICAA, NJC is the debtor to the 8th Amendment, which is a credit agreement. 815 ILCS 160/1 (West 2009). The ICAA expressly prohibits NJC from maintaining actions on or in any way related to such a credit agreement unless the credit agreement is signed by the creditor and debtor. 815 ILCS 160/2 (West 2009). The Guarantor's Consent to the 8th Amendment contains only Chip Ganassi's signature. *See* Defendants' Exhibit 102 - 8th Amendment. Neither Harris Bank, nor any of the syndicate banks, nor NJC signed the Guarantor's Consent. Accordingly, the ICAA bars any and all claims in any way related to the credit agreement - *i.e.* the 8th Amendment - because the creditor, Harris Bank and syndicates, as well as the debtor, NJC, failed to sign the Guarantor's Consent to the 8th Amendment.

Consequently, Defendants are entitled to judgment as a matter of law on Plaintiff's breach of guaranty claim.

**WHEREFORE,** Defendants, FLOYD "CHIP" GANASSI and GANASSI GROUP, LLC, respectfully request this Honorable Court to enter judgment as a matter of law in their favor and against Plaintiff as to Count I of Plaintiff's Complaint.

Respectfully submitted,

By: /s Keely Lewis Wise
**One of the Attorneys for Defendants, FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC**

**DATE: December 11, 2009**

Brian W. Bell, #160431
Keely Lewis Wise, #6280469
Alfred K. Murray II, #6297264
**SWANSON, MARTIN & BELL, LLP**
330 North Wabash Avenue - Suite 3300
Chicago, Illinois 60611
(312)321-9100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) ) | Judge Manning |
| | | Magistrate Judge Nolan |
| Defendants. | ) ) | |

**EXHIBIT A**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S**
**RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1  Q.  Let me restate the question.

2  A.  I'm sorry.

3  Q.  It's not a problem.  I'm happy to repeat it.

4      When the negotiations with Chip stopped, you then

5  continued to combine with Hawthorn and also to market the

6  property for sale, which it was eventually sold to Cicero?

7  A.  The only thing I would add to that is at that time we also

8  were talking to a buyer for NJC without going into merging with

9  HRC.  So there were still more options on the table that we were

10 trying to sort through.

11 Q.  Okay.  But eventually you terminated the lease?

12 A.  Yes.

13 Q.  And you caused your lawyers to do that?

14 A.  Yes.

15 Q.  And would you go to Exhibit No. 204, Plaintiff's 204.  Maybe

16 it's 203.  Sorry.  I keep missing by one.

17      This is the letter that Mr. Pranger sent terminating the

18 lease, is it not?

19 A.  Yes, it is.

20 Q.  And you would have reviewed that prior to sending it?

21 A.  Yes, yes.

22 Q.  And Mr. Pranger was then a lawyer with your present counsel's

23 firm?

24 A.  Yes.

25 Q.  And this letter sets out the reason for the termination?

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) | Judge Manning<br><br>Magistrate Judge Nolan |
| Defendants. | ) ) | |

**EXHIBIT B**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1    A.    Yes, sir.

2    Q.    That's your signature there?

3    A.    Yes, it is.

4    Q.    And when you signed it, you signed it as the president

5    of National Jockey Club.

6    A.    Yes, I did.

7    Q.    And as the president of National Jockey Club, you

8    understood that the personal guaranty was expressly part of

9    the lease, did you not?

10   A.    Yes.

11   Q.    As a matter of fact, it not only says it's a part of the

12   lease, but it's, in fact, attached to the lease.  It's in the

13   same document, is it not?  Exhibit 28.

14   A.    Yes.

15   Q.    And when you signed as president of National Jockey

16   Club, what you understood was that if Chicago Motor Speedway,

17   the tenant, was unable to pay the rent, which we've talked

18   about in paragraph 3, that in that instance National Jockey

19   Club could look to Mr. Ganassi for payments up to a maximum

20   of 22-5.

21            That's what your understanding was, was it not?

22   A.    Yes, sir.

23   Q.    All right.  And so the payments that they could look to

24   included principal, it included interest, and related

25   construction charges, related loan charges, right?

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) | Judge Manning |
| | ) | Magistrate Judge Nolan |
| Defendants. | ) ) | |

**EXHIBIT C**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S**
**RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

```
 1    Q.    But Chip's guaranty was with CMS and NJC in Exhibit 28,
 2    right?
 3              MS. BARAN:  Objection.  Assumes a fact not in
 4    evidence, the guaranty being with CMS.
 5              MR. BELL:  I'll withdraw the question.
 6              THE COURT:  Okay.  It's withdrawn.
 7    BY MR. BELL:
 8    Q.    Chip's guaranty was given to NJC as part of the lease,
 9    right?
10    A.    Yes.
11    Q.    But the stock was held by the bank?
12    A.    Yes.
13    Q.    So it was necessary to document the sale of the stock
14    because the bank didn't have a guaranty with Chip Ganassi,
15    did they?
16              MS. BARAN:  Objection.  Calls for a legal
17    conclusion and speculation.
18              THE COURT:  It doesn't call for a legal conclusion.
19    It's a factual -- if he knows, he knows.  If he doesn't, he
20    can so indicate.
21              THE WITNESS:  I don't know that it did or didn't.
22    BY MR. BELL:
23    Q.    You're not aware, as the president of NJC and the person
24    who has been directing this litigation, that Chip Ganassi had
25    any separate guaranty with the bank, are you?
```

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) | Judge Manning |
| | ) | Magistrate Judge Nolan |
| Defendants. | ) ) | |

**EXHIBIT D**
**TO**
**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S**
**RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1    Q.    Let's take a look at 166 A, paragraph 1.  That says:

2    "This guaranty is a continuing, absolute, and unconditional

3    guaranty, and shall remain in full force and effect until

4    written notice of its discontinuance shall be actually

5    received by the bank."

6              Right?  It says that, does it not?

7    A.    Yes, it does.

8    Q.    There is no language in Chip's guaranty, Exhibit 28,

9    that it is a continuing guaranty, is there?

10   A.    Not that I remember, no.

11   Q.    All right.  Nor is there any language that it's an

12   absolute and unconditional guaranty, is there?

13   A.    Just looking again, but --

14   Q.    If you could sort of keep them side by side, that would

15   help us.

16   A.    No, I don't see that.

17   Q.    Looking at paragraph 3 of 166, it says:  "The liability

18   hereunder shall in no wise be affected or impaired by," and

19   bank is hereby authorized to make from time to time, "any

20   sale, pledge, surrender, compromise, release, extension,

21   alteration, substitution."

22              There's no such language like that in Chip's

23   guaranty either, is there?

24   A.    No, there is not.

25   Q.    And then if we go on to like paragraph 7, on page 3, on

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) | Judge Manning Magistrate Judge Nolan |
| Defendants. | ) ) ) | |

**EXHIBIT E**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1    Exhibit No. 166, it says:  "The undersigned waives any and

2    all defenses, claims and discharges of the borrower or the

3    obligor pertaining to the indebtedness."

4            There's no paragraph like that in Chip's guaranty

5    either, is there?

6    A.   No, sir.

7    Q.   And then if you go to page 4, I think your lawyer

8    pointed out this notice.  It says:  "Important notice to

9    guarantors."

10           Do you see that on page 4?

11   A.   Yes, sir.

12   Q.   It says:  "You are being asked to guarantee this debt,"

13   et cetera, and:  "You may have to pay the full --" there's

14   nothing like that in Chip's guaranty, is there?

15   A.   No, sir.

16   Q.   Chip's guaranty, unlike this guaranty, was limited to a

17   specific figure, that being 22-5, isn't that true?

18   A.   Yes, sir.

19   Q.   And Chip's guaranty was not a continuing guaranty, was

20   it?

21           MS. BARAN:  Objection.  Calls for a legal

22   conclusion.

23           THE COURT:  Rephrase, Counsel.

24   BY MR. BELL:

25   Q.   There is no language in Mr. Ganassi's guaranty that

1    indicates that the guaranty is of a continuing nature, is

2    there?

3             MS. BARAN:  Objection.  Still calls for a legal

4    conclusion.

5             THE COURT:  Overruled.

6             THE WITNESS:  I do not see continuing.

7    BY MR. BELL:

8    Q.   Nor any other language that would infer that it's

9    continuing, is there?

10            MS. BARAN:  Objection.  Calls for a legal

11   conclusion.

12            THE COURT:  I'm sorry.  No other language that

13   what?

14            MR. BELL:  Let me withdraw it, your Honor.

15   BY MR. BELL:

16   Q.   There's no other -- certainly continuing, there is no

17   language that is a continuing guaranty, but there's no other

18   similar words as continuing in his guaranty.

19   A.   No.

20   Q.   And you had the benefit of a lawyer on this guaranty and

21   lease, that being Mr. Lalich?

22   A.   Yes, sir.

23   Q.   And as you mentioned, you were a seasoned businessman at

24   that time?

25   A.   Yes, sir.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) ) | Judge Manning

Magistrate Judge Nolan |
| Defendants. | ) | |

**EXHIBIT F**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1    indicates that the guaranty is of a continuing nature, is

2    there?

3            MS. BARAN:  Objection.  Still calls for a legal

4    conclusion.

5            THE COURT:  Overruled.

6            THE WITNESS:  I do not see continuing.

7    BY MR. BELL:

8    Q.   Nor any other language that would infer that it's

9    continuing, is there?

10           MS. BARAN:  Objection.  Calls for a legal

11   conclusion.

12           THE COURT:  I'm sorry.  No other language that

13   what?

14           MR. BELL:  Let me withdraw it, your Honor.

15   BY MR. BELL:

16   Q.   There's no other -- certainly continuing, there is no

17   language that is a continuing guaranty, but there's no other

18   similar words as continuing in his guaranty.

19   A.   No.

20   Q.   And you had the benefit of a lawyer on this guaranty and

21   lease, that being Mr. Lalich?

22   A.   Yes, sir.

23   Q.   And as you mentioned, you were a seasoned businessman at

24   that time?

25   A.   Yes, sir.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) | Judge Manning Magistrate Judge Nolan |
| Defendants. | ) ) ) | |

**EXHIBIT G**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1  A.  Yes.

2  Q.  So wouldn't you agree, ma'am, that at the time the lease was

3  terminated, that the Ganassi side had paid a considerable, a lot

4  more rent than the NJC side?

5  A.  They had paid more rent in terms of principal and interest,

6  yes, at the time, yes.

7  Q.  A lot more?

8  A.  A lot more, yes.

9  Q.  Tens of -- well, more than $10 million more at the time of

10 termination?

11 A.  Well, this is recapping debt, right?  It's not recapping

12 everything that's inside of rent.

13 Q.  Ma'am --

14 A.  So you're asking me about rent.  I'm sorry.

15 Q.  Yes.  I'm not asking you about operational.  I'm not asking

16 you about anything other than rent.  For the moment, we're really

17 talking about principal here.

18         Ganassi had paid more than $10 million of rent more than

19 NJC had when the lease was terminated?

20 A.  I can answer $10 million more in principal -- in principal.

21 But rent is a different thing.  So yes, the numbers clearly show

22 here that.

23 Q.  Okay.  And at the time that lease was terminated, the bank

24 had agreed to the Silverman plan?

25 A.  Yes.

1 Q. And the bank had agreed that there would not be a principal
2 payment due for some time to come?
3 A. I don't know the definition of "some time to come." They
4 gave us some flexibility. I don't remember exactly when our
5 first principal payment was due.
6 Q. All right. It certainly wasn't due on the date of the lease
7 termination?
8 A. Right, correct.
9 Q. And the interest was also paid up on the date of the
10 termination?
11 A. Yes.
12 Q. Okay. Ms. Bidwill, in the letters that we saw this morning,
13 and I'm certainly not going to rehash them, but referring to the
14 letters that you wrote to Mr. Ganassi during that period of time,
15 there was not a single mention of a claim that you were
16 threatening to make on Chip Ganassi's guaranty, was there?
17 A. Well, he mentioned --
18 Q. Ma'am, I think my question was in your --
19 A. In my letter, in all the letters that I just wrote to him?
20 Q. No.
21 A. Sorry, sorry.
22 Q. That's okay.
23        In the letters that we reviewed this morning, I think
24 there were four or five of them talking about transactions and
25 deals and the way to restructure, there wasn't any comment by you

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 3743 |
| | ) | |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a | ) ) | Judge Manning |
| Limited liability company, | ) | Magistrate Judge Nolan |
| | ) | |
| Defendants. | ) | |

**EXHIBIT H**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1   A.  Yes.

2   Q.  So wouldn't you agree, ma'am, that at the time the lease was

3   terminated, that the Ganassi side had paid a considerable, a lot

4   more rent than the NJC side?

5   A.  They had paid more rent in terms of principal and interest,

6   yes, at the time, yes.

7   Q.  A lot more?

8   A.  A lot more, yes.

9   Q.  Tens of -- well, more than $10 million more at the time of

10  termination?

11  A.  Well, this is recapping debt, right?  It's not recapping

12  everything that's inside of rent.

13  Q.  Ma'am --

14  A.  So you're asking me about rent.  I'm sorry.

15  Q.  Yes.  I'm not asking you about operational.  I'm not asking

16  you about anything other than rent.  For the moment, we're really

17  talking about principal here.

18          Ganassi had paid more than $10 million of rent more than

19  NJC had when the lease was terminated?

20  A.  I can answer $10 million more in principal -- in principal.

21  But rent is a different thing.  So yes, the numbers clearly show

22  here that.

23  Q.  Okay.  And at the time that lease was terminated, the bank

24  had agreed to the Silverman plan?

25  A.  Yes.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) | Judge Manning |
| | ) | Magistrate Judge Nolan |
| Defendants. | ) ) | |

**EXHIBIT I**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

Bidwill - direct by Baran

1  Q.  At this juncture, had Harris Bank called the loan for

2  National Jockey Club?

3  A.  No.

4          MS. BARAN:  Move to admit Plaintiff's Exhibit 103.

5          MR. BELL:  No objection.

6          THE COURT:  It will be received.

7      (Plaintiff's Exhibit 103 received in evidence.)

8          MS. BARAN:  I could stand here for a couple minutes.

9  No, I'm just kidding.  Just kidding.

10  BY MS. BARAN:

11  Q.  Did you put any money into National Jockey Club?

12  A.  Yes, I did.

13  Q.  How much money did you put in?

14  A.  Over half a million dollars.

15  Q.  Are you one of the subordinated debtors?

16  A.  Yes, I am.

17  Q.  Why did you put money into National Jockey Club?

18  A.  Because, you know, we had a strategy and a plan to try to

19  meet our obligations with the bank.  You know, we had a company

20  that was 70 years in business, a lot of employees.  So I

21  believed that the strategy that we came up with would allow us

22  to continue paying down this debt, but we could not -- part of

23  that strategy, in addition to selling the property, it required

24  additional equity.  So I asked a lot of different family

25  members to put in that equity so that we would have enough

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) | Judge Manning |
| | ) | Magistrate Judge Nolan |
| Defendants. | ) ) | |

**EXHIBIT J**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1  the third and the eighth amendments, whether National Jockey

2  Club was in default of the construction loan agreement?

3  A.  Yes.

4  Q.  Do you recall the bank ever sending National Jockey Club a

5  notice of default?

6  A.  No.

7  Q.  Rather than be in default, what did National Jockey Club --

8           MS. BARAN:  Strike that.

9  BY MS. BARAN:

10  Q.  Did National Jockey Club get waivers of its failures to

11  satisfy the financial covenants?

12  A.  Yes, they did.

13  Q.  And what in exchange did National Jockey Club give to the

14  bank to excuse or to waive their failure to comply with the

15  financial covenants?

16  A.  Well, they increased our EBITDA requirements for the horse

17  racing events.

18  Q.  What payments were made after the execution of the third

19  amendment?

20  A.  To the bank?

21  Q.  Yes.  Immediately upon execution, what was required by the

22  bank, the third amendment?

23  A.  Third amendment?  Five and a half million dollars.

24  Q.  And we've talked about what was also required to be paid

25  beyond the $12 million in exchange for the release of the

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) | Judge Manning Magistrate Judge Nolan |
| Defendants. | ) ) | |

**EXHIBIT K**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1  Q.  Look back all the way to page 2, the second page in.

2  You're looking for the document that's now up on the screen.

3  A.  Okay.  It's not -- okay.  Yes, I have it.

4        MR. BELL:  All right.  Would you give us a little

5  wider shot of that, Eric, please?

6     (Brief pause.)

7  BY MR. BELL:

8  Q.  Looking at Exhibit No. 221B, that is your accounting

9  department's tracking of what Mr. Ganassi had paid into this

10  project, is it not?

11  A.  This is what we credited Ganassi Group's contributions for,

12  yes.

13  Q.  All right.  It's clear that you agree today that the total

14  contribution was 28 million -- 28 and a half million dollars?

15  A.  Yes.

16  Q.  And all of those payments, as far as you were concerned

17  when you made this, were all legitimate, and there wasn't any

18  controversy about that amount of money, was there?

19  A.  This was not prepared by me, but I relied on it and I

20  believe it's factual and truthful.

21  Q.  Okay.  Let's go to 21B, please.  That would be, I think,

22  the third from the last, same date, October of 2002 shortly

23  before the lease was terminated.

24  A.  October 9th?

25  Q.  Yes, sir.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an<br>Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 3743 |
| | ) | |
| FLOYD "CHIP" GANASSI and CHIP | ) | Judge Manning |
| GANASSI GROUP, L.L.C., a | ) | |
| Limited liability company, | ) | Magistrate Judge Nolan |
| | ) | |
| Defendants. | ) | |

**EXHIBIT L**
**TO**
**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S**
**RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1  BY MS. BARAN:

2  Q.   And the full title of the Race Team is?

3  A.   Chip Ganassi Race Teams, Inc.

4  Q.   Now, you personally have income, correct?

5  A.   In those days.

6  Q.   And Racing Teams also had income in those days?

7  A.   Yes.

8  Q.   And when the -- but Group itself did not have any bank

9  account or any income, correct?

10 A.   Group did not have any bank account, or checking

11 account, or employees, or anything else.  I think we've said

12 that ad nauseum.

13 Q.   Well, I'm hearing it from you, Chip.

14 A.   Yes.

15 Q.   And when money was requested of Group, the money came

16 from its members, correct?

17 A.   All the money that came, when Charlie would call me and

18 say hey, we need money, I sent him money.

19 Q.   And that money came from Group, which was a member of

20 CMS?

21 A.   It came from wherever I had money.  Yes.

22 Q.   Over time, Chip Ganassi Group LLC added new members,

23 correct?

24 A.   Late, later in the -- yes.

25 Q.   In 2000 it added your father, Floyd Ganassi?

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) ) | Judge Manning<br><br>Magistrate Judge Nolan |
| Defendants. | ) ) | |

**EXHIBIT M**
**TO**
**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S**
**RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1    wouldn't you think that that would satisfy his guaranty?

2            MS. BARAN:  Objection.  Calls for a legal

3    conclusion.

4            THE COURT:  It's speculative, too, so I'll sustain

5    the objection.

6            MR. BELL:  Could I just be heard a second on that,

7    your Honor?

8            I'll tell you what.  I'll go ahead.

9    BY MR. BELL:

10   Q.  In any event, Mr. Bidwill, you're not in any position to

11   contest the fact that Chip has paid, you know, close to $23

12   million in interest and principal in this matter, are you?

13          MS. BARAN:  I'm going to object to the form of the

14   question.

15          THE COURT:  Overruled.  He may answer if he can.

16   If he knows.

17          THE WITNESS:  Say it again.

18   BY MR. BELL:

19   Q.  Sorry.  Here's what happened.  If CMS didn't have enough

20   money, you had a good relationship with Chip Ganassi, did you

21   not?

22   A.  Yes, sir.

23   Q.  And you would call him from time to time and say:  Hey,

24   Chip, we're short; can you send some money?

25   A.  Yes, sir.

1    Q.    And he did that by and large, didn't he?

2    A.    Yes, sir.

3    Q.    And wouldn't you agree that if Chip Ganassi sent that

4    money at your request, and it included more than 23, almost

5    $24 million of principal and interest, wouldn't you agree as

6    president of NJC that that should count against and reduce

7    his guaranty?

8              MS. BARAN:  Objection.  Calls for legal conclusion.

9    I'd like to be heard.

10             THE COURT:  I'm going to sustain the objection.

11   BY MR. BELL:

12   Q.    Mr. Bidwill, there is a -- well, I'll come back to that.

13   And I missed something.

14             Mr. Bidwill, you're familiar with the subject of

15   conversion costs?

16   A.    Yes, sir.

17   Q.    Conversion costs are those expenses that are incurred

18   moving the dirt on the track and off the track and things

19   like that.  Right?

20   A.    Yes, sir.

21   Q.    And in this case, when you put that exhibit back

22   together, would you go to Exhibit No. 28.  My question will

23   be --

24   A.    I'm sorry.  Which exhibit?

25   Q.    28.  It's the lease.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 3743 |
| FLOYD "CHIP" GANASSI and CHIP GANASSI GROUP, L.L.C., a Limited liability company, | ) ) ) ) | Judge Manning Magistrate Judge Nolan |
| Defendants. | ) ) | |

**EXHIBIT N**

**TO**

**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

1 over this exhibit this morning?

2 A.  Yes.

3 Q.  And what happened is Chicago -- well, the loan was -- or the

4 bank was unhappy, and they wanted $5 million, right, for

5 principal?

6 A.  That's putting it shortly, yes.  We were in default.

7 Q.  You were in default, and the bank wanted a $5 million cash

8 payment.  And National Jockey Club did not have all of that

9 money, did it?

10 A.  No.

11 Q.  And so you called Chip Ganassi and asked him for money, did

12 you not?

13 A.  I'm sure a request was made to Mr. Ganassi or Ganassi Group,

14 yes.

15 Q.  Well, you told us yesterday that you spoke to Chip to get

16 that money, did you not?

17 A.  I'm sure I spoke to him.

18 Q.  And somebody on behalf of Mr. Ganassi sent that money, didn't

19 they?

20 A.  Yes, sir, I believe so.

21 Q.  And you as you sit here today don't know the source of that

22 funds, do you?

23 A.  No, sir.

24 Q.  You don't know the source of any of the funds that

25 Mr. Ganassi sent in, do you?

 1 | A.  You mean from -- I don't know what you mean by that.
 2 | Q.  All right.  You don't know out of what accounts the moneys
 3 | came from.  You never saw the check come in?
 4 | A.  No, sir.
 5 | Q.  What you were happy with is that Chip kept sending money?
 6 |           MS. BARAN:  Objection, argumentative.
 7 |           THE COURT:  I'll sustain the objection.  That was not a
 8 | question either.
 9 |           MR. BELL:  All right.
10 | BY MR. BELL:
11 | Q.  In any event, Mr. Ganassi made good on his promise to pay
12 | $2,750,000 into that principal payment, did he not?
13 | A.  Yes.
14 | Q.  And I think this morning you testified that you thought that
15 | was a loan from Mr. Ganassi?
16 | A.  Yes, I did.
17 | Q.  Is that loan reflected anywhere on Exhibit 221?
18 | A.  I'd have to look at 221, sir.
19 | Q.  Well, let's look at 221.
20 | A.  Where is that?
21 | Q.  I believe that's defendants'.
22 | A.  Defendants', right?
23 | Q.  Do you see Exhibit No. 221?
24 | A.  Yes, I do.
25 | Q.  And do you see any loans on that document?

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL JOCKEY CLUB, an<br>Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 3743 |
| | ) | |
| FLOYD "CHIP" GANASSI and CHIP | ) | Judge Manning |
| GANASSI GROUP, L.L.C., a<br>Limited liability company, | ) | |
| | ) | Magistrate Judge Nolan |
| | ) | |
| Defendants. | ) | |

**EXHIBIT O**
**TO**
**FLOYD "CHIP" GANASSI AND GANASSI GROUP, LLC'S**
**RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

Kras - cross by Bell

 1  A.  Based on this document, yes.

 2  Q.  Okay.  So in total you'd agree that Chip Ganassi funded

 3  $18,750,000 of loan payments, would you not?

 4  A.  I would agree that either Mr. Ganassi or Ganassi Group

 5  funded that amount, yes.

 6  Q.  I'm sorry.  What did you say?

 7  A.  Either Mr. Ganassi or Ganassi Group funded that

 8  $18 million, yes.

 9  Q.  But you know that it was Chip Ganassi, don't you?

10  A.  I would believe it's one and the same, but I don't know the

11  nature of all the transactions.

12  Q.  Okay.  Do you recall giving your deposition?  I think you

13  came to my office three times?

14  A.  I believe you've said that, yes, and I would concur.

15  Q.  And do you recall being asked this question at page 156?

16          MS. BARAN:  Of which one?

17          MR. BELL:  That would be page -- or that would be

18  Volume 1.

19          MS. BARAN:  Volume 1.  Which date was that?  Oh,

20  here, I got it.  Okay.  I'm sorry.  The page again?

21          MR. BELL:  Page 156.

22          MS. BARAN:  Do you have a line number?

23          MR. BELL:  Yes, line 12.

24  BY MR. BELL:

25  Q.  Do you recall being asked this question by myself: