**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NATIONAL JOCKEY CLUB,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **04 C 3743** |
| | ) | |
| **FLOYD "CHIP" GANASSI and CHIP** | ) | |
| **GANASSI GROUP, LLC,** | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This case flows from the transformation of Sportsman's Park, a horse racing venue in

Cicero, Illinois, owned by plaintiff National Jockey Club ("NJC"), into the Chicago Motor

Speedway ("CMS"), an ultimately unsuccessful facility for horse and auto racing. To effect this

transformation, NJC and defendant Chip Ganassi Group, LLC ("Ganassi Group") formed CMS,

an Illinois limited liability company. Construction was financed through a construction loan and

capital contributions by NJC and Ganassi Group. In addition, defendant Floyd "Chip" Ganassi,

who is involved in professional motor racing as both a driver and operator of motor racing teams

in the United States, personally guaranteed CMS's obligations under the lease up to $22.5

million, although that amount was subsequently reduced to $10.5 million.

The court found that certain issues were equitable and thus had to be decided by the court.

It then held a jury trial, and the jury awarded damages to NJC on its breach of contract claim

against Mr. Ganassi based on the guaranty and to Ganassi Group based on its breach of contract

counterclaim based on a contract between NJC and Ganassi Group regarding operation of CMS.

Three post-trial motions are before the court: (1) NJC's renewed motion for judgment as a matter

of law as to defendants' counterclaims or, in the alternative, for a new trial; (2) Mr. Ganassi's

renewed motion for a new trial; and (3) Mr. Ganassi's motion for judgment as a matter of law. In addition, Mr. Ganassi's claim for recission or, alternatively, a set-off are before the court as these issues were reserved for a bench trial. For the following reasons, the parties' post trial motions are denied and the court finds that Mr. Ganassi is not entitled to rescission or a set-off.

## I.      Background

The court begins with a brief summary of the facts presented at trial, the jury's verdict, and the equitable issues remaining for the court's determination.

### A.      The Parties

In 1928, Al Capone opened Sportman's Park in Cicero, Illinois, as a dog racing venue. By the time of the events at issue in this lawsuit, NJC (an Illinois corporation with its principal place of business in Illinois) owned and operated Sportsman's Park and featured pari-mutuel horseracing there.[1] Defendant/counterplaintiff Floyd "Chip" Ganassi is a former racecar driver who currently operates professional motor racing teams and is a citizen of Pennsylvania. Ganassi Group LLC ("Ganassi Group") is a limited liability company whose members consist of Mr. Ganassi and Chip Ganassi Racing Teams, Inc. ("Teams"), a Michigan corporation with its principal place of business in Michigan.

---

[1] Pari-mutuel betting is a system of cooperative wagering that originated in France in the 1870s. Translated from French, it means betting among ourselves (pari="bet" and mutuel="mutual"). It is generally credited to Pierre Oller, a Parisian perfume shop owner. Bettors divide the total amount of money bet on a race (the pool) after deductions for tax and racetrack expenses based on the type of bets made, each bettor's success, and the results of the race.

### B.      Chicago Motor Speedway

#### 1.      The Operating Agreement

In 1997, representatives of NJC met with Mr. Ganassi and his representatives to discuss the idea of converting Sportsman's Park into a facility for both horse and auto racing.  Mr. Ganassi decided to form Ganassi Group, and then NJC and Ganassi Group agreed to form a limited liability company known as Chicago Motor Speedway, LLC ("CMS").  On March 10, 1999, NJC and Ganassi Group thus executed the "Chicago Motor Speedway Limited Liability Company Operating Agreement" (the "Operating Agreement").  CMS was a manager-managed Illinois limited liability company.  Under the Operating Agreement, Ganassi Group and NJC served as members of CMS, and four managers were appointed to act as managers of CMS.

#### 2.      The Lease and Personal Guaranty

On July 8, 1998, NJC, in its capacity as landlord of the Sportsman's Park facility, entered into a lease under which CMS was the tenant and leased the real property and racing facilities at Sportsman's Park for the purpose of conducting motor sports events (the "Lease").  Mr. Ganassi's personal guaranty was part of the Lease and provided, in pertinent part, that:

> For value received, and as consideration and inducement for National Jockey Club to enter into the above and foregoing Lease with the Chicago Motor Speedway, LLC of which this personal guaranty is a part, the undersigned, Mr. Chip Ganassi of Pittsburgh, Pennsylvania, does hereby personally guaranty repayment of fifty percent (50%) of funds borrowed to make Landlord Improvements as set forth in Section 8(a) of the above and foregoing lease but limited to a maximum personal guaranty of $22,500,000.00; provided however, that National Jockey Club and Chicago Motor Speedway L.L.C. agree to use their best reasonable efforts to remove and vacate the requirement of the personal guaranty of Chip Ganassi as soon as acceptable to the lender(s) of the aforesaid primary financing for Landlord Improvements for which Chip Ganassi provides his personal guaranty.

In addition to the foregoing, Chip Ganassi, National Jockey Club, and the Chicago Motor Speedway L.L.C. agree to use their best efforts to remove and vacate the requirement for any required mortgage of the Premises by National Jockey Club as soon as acceptable to the lender(s) of the aforesaid primary financing for Landlord Improvements for which National Jockey Club may be required to provide a mortgage on the Premises.

The agreement to use best efforts to remove and vacate the Personal Guaranty of Chip Ganassi and the required mortgage of National Jockey Club are separate, distinct, and independent obligations and considerations of the parties to this Lease Agreement, and the accomplishment of one is not contingent on the accomplishment of the other.

NJC's Ex. 28.

### 3. Financing Chicago Motor Speedway

NJC and Mr. Ganassi understood that converting Sportsman's Park into a horse/motor sports venue was a very expensive proposition. They anticipated that NJC, the owner of the Sportsman's Park facility, would need to mortgage the Sportsman's Park property and improvements as security for financing and that Mr. Ganassi would need to personally guarantee the loans necessary to secure the funds needed to transform the property. They also contemplated that Teams would pledge its 720,000 shares of Championship Auto Racing Teams, Inc. ("CART") as additional security.

On November 18, 1998, NJC executed a Construction Loan Agreement ("CLA") with Harris Bank, N.A., and a syndicate of other banks (the "Bank Group") to partially finance construction of CMS. As security for the loan, NJC granted the Bank Group a mortgage and security interest in the Sportsman's Park property and improvements, including the new facilities to be built with the loan proceeds. In addition, Teams pledged 720,000 shares of CART stock by

executing a Pledge Agreement. The next day, the Lease and Mr. Ganassi's personal guaranty were assigned to the Bank Group.

### 4. The Eighth Amendment

Beginning in 2000, Teams sought to obtain the Bank Group's consent to release the Bank Group's security interest in the CART stock. On July 11, 2001, NJC, each of the banks in the Bank Group, and Mr. Ganassi (individually and on behalf of Teams) executed a document entitled "Eighth Amendment, Waiver and Consent to Construction Loan Agreement" (the "Eighth Amendment"). The Eighth Amendment provided in relevant part that:

> Racing Teams has heretofore executed and delivered to the Agent its Pledge and Security Agreement (the "Pledge Agreement") dated as of November 19, 1998 and the Guarantor has executed a personal guaranty of the Lease and each hereby consents to the Eighth Amendment, Waiver and Consent to the Construction Loan Agreement as set forth above. The Guarantor confirms that his guaranty of the Lease and all of its obligations thereunder remain in full force and effect to the extent of $10,500,000. Each of the undersigned further agrees that the consent of the undersigned to any further amendments to the Agreement shall not be required as a result of this consent having been obtained.

NJC Ex. 102.

Pursuant to the Eighth Amendment, the Bank Group released their security interest in the CART stock in exchange for a payment of $12,000,000 on the outstanding loan balance. In addition, as part of this transaction, Mr. Ganassi's $22,500,000 guaranty was reduced to $10,500,00. *See id*.

### 5. The Demise of CMS

Unfortunately for all involved, the CMS project was not a success. Thus, in February of 2002, NJC and Ganassi Group agreed to cease operations at the facility and CMS defaulted on the CLA. Harris Bank, acting for the Bank Group, declared the loan in default. From February

of 2002 until August of 2002, Patricia Bidwell (the newly named Chairman of the Board at NJC) worked with the Bank Group to renegotiate the CLA. These efforts were not fruitful, and NJC was eventually forced to sell the Sportsman's Park facility and improvements to the Town of Cicero to pay down the CLA.

On October 16, 2002, NJC sent CMS and Mr. Ganassi a letter stating that NJC considered CMS to be in default under the Lease and thus was terminating the Lease. Both NJC and Mr. Ganassi each blamed the other for failing to meet CMS's financial obligations. In 2006, while this case was pending, the Bank Group sold the note associated with NJC's loan to DII Northwest, which called it. Since NJC could not cover the amounts it owed, it filed for protection under Chapter 11 of the United States Bankruptcy Code. In the bankruptcy case, the parties reached a settlement regarding the distribution and allocation of any proceeds recovered by NJC in this case.

### C. The Trial

At trial, NJC litigated its single claim against Mr. Ganassi, contending that he failed to meet his obligations under the guaranty after CMS went into default. The jury returned a verdict in favor of NJC and against Mr. Ganassi in the amount of $8,850,000.00.

With respect to the defendants' claims, by the time trial commenced, Ganassi Group's single counterclaim against NJC was for breach of § 6.1 of the CMS Operating Agreement, which provided that:

> 6.1    <u>Authority: Liability to Third Parties; Member Independence</u>. No Member has the authority or power to act for or on behalf of the Company to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court. Except as

> otherwise specifically provided herein, neither the Company nor any Member shall have any rights in or to any ventures pursued by any other member or the income or profits therefrom, whether taking place at Sportman's Park, Cicero, Illinois[,] or elsewhere.

NJC Ex. 29, § 6.1.  The jury returned a verdict in favor of Ganassi Group and against NJC on this claim in the amount of $4,000,000.00.

Following the rendering of the verdicts, the court took Mr. Ganassi's recission claim and Mr. Ganassi's set-off affirmative defense under advisement and asked the parties to brief these issues with their post-trial motions.[2]  NJC then renewed its motion for judgment as a matter of law as to defendants' multi-count counterclaim or, in the alternative, for a new trial.  In turn, Mr. Ganassi renewed his motions for a new trial and for judgment as a matter of law.  He also filed a memorandum in support of his counterclaim seeking rescission or, alternatively, an order authorizing set-off of the jury verdict in favor of Ganassi Group on its counterclaim against the jury verdict in favor of NJC and against him personally.

For the following reasons, the court finds that Mr. Ganassi is not entitled to rescind the guaranty or to receive a set-off.  It also denies all of the remaining post-trial motions except NJC's motion for judgment as a matter of law as to Counts II and IX of Ganassi Group's counterclaims, which is granted.

---

[2]  At the time that trial commenced, Mr. Ganassi's pending affirmative defenses were: lack of privity, satisfaction and discharge, failure of consideration, material breach by NJC, increased risk, wrongful termination of the Lease, breach of the duty of good faith and fair dealing, and lack of default by the obligor.

## II.    NJC's Motion for Judgment as a Matter of Law as to Defendants' Counterclaims Or, Alternatively, for a New Trial

When considering a motion for judgment as a matter of law, the court must consider "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010).

At trial, the Ganassi Group proceeded with Counts II and IX of its counterclaims (breach of the duty of good faith and fair dealing based on the Lease and Operating Agreement and breach of the Lease and Operating Agreement, respectively). Alternatively, the Ganassi Group sought rescission of the Lease and Operating Agreement pursuant to Count X of its counterclaims. *See* Dkt. 335-1 (Ganassi Group's election of remedies, attached to NJC's renewed motion for judgment as a matter of law).

NJC's motion for judgment as a matter of law as to defendants' counterclaims or, alternatively, for a new trial seeks judgment as a matter of law as to Counts II and IX based on four theories: (1) Ganassi Group lacks standing to pursue claims because it cannot pursue claims on behalf of CMS; (2) Ganassi Group did not suffer damages as a result of the alleged breach of the Operating Agreement and cannot recover based on damages CMS suffered; (3) Ganassi Group is neither a party to the Lease nor a third-party beneficiary of the Lease and thus cannot pursue claims based on an alleged breach of the Lease; and (4) the Ganassi Group cannot seek to rescind the Lease and Operating Agreement because the parties cannot be returned to the status quo existing prior to the execution of these documents. Alternatively, NJC requests that if its motion for judgment as a matter of law is granted as to the rescission counterclaim (Count X), it

is entitled to a new trial and in support, directs the court's attention to §§ (A) and (B) of its original motion for judgment as a matter of law, Dkt. 316.

### A. Ganassi Group's Standing to Pursue Claims on Behalf of CMS and to Seek Damages Under the Operating Agreement

The court will address NJC's first arguments together. As noted above, NJC and Ganassi Group formed CMS and were parties to the Operating Agreement. According to NJC, the testimony at trial showed that CMS, not Ganassi Group, incurred injuries as a result of the demise of the CMS project because the injuries claimed by Ganassi Group flow from NJC's allegedly improper allocation of expenses and, specifically, NJC's charging of certain of its expenses to CMS instead of itself. NJC thus concludes that because CMS was the injured party, and Ganassi Group did not sue derivatively on behalf of CMS, Ganassi Group lacks standing to pursue claims that properly belong to CMS. Approaching this argument from a slightly different angle, NJC contends that the evidence shows that CMS – not Ganassi Group – suffered damages as a result of the alleged breach of the Operating Agreement. Hence, NJC concludes that Ganassi Group cannot recover damages.

In response, Ganassi Group points to the Illinois Limited Liability Company Act, which provides in pertinent part that:

Actions by Members

(a) A member may maintain an action against a limited liability company or another member for legal or equitable relief, with or without an accounting as to the company's business, to enforce all of the following:

 (1) The member's rights under the operating agreement.

 (2) The member's rights under this Act.

<blockquote>
(3)      The rights and otherwise protect the interests of the member, including rights and interests arising independently of the member's relationship to the company.
</blockquote>

805 ILCS § 180/15-20.

CMS was a limited liability company, and NJC and Ganassi Group were both members of CMS. Moreover, NJC and Ganassi Group were the parties to the Operating Agreement. To the extent that NJC is arguing that Ganassi Group may not file suit at all based on Ganassi Group's claims about CMS's finances (an argument NJC made in its initial motion but retreated from in its reply), NJC is incorrect as Ganassi Group may file suit based on its own injuries incurred in connection with CMS's financial dealings.

Moreover, Ganassi Group claims that the alleged accounting malfeasance overinflated the contributions it was supposed to make to CMS and wrongfully benefitted NJC because NJC underfunded its contributions to CMS. Ganassi Group presented evidence at trial in support of these theories. Thus, Ganassi Group presented evidence that it directly incurred damages due to the alleged breach of the Operating Agreement. This means that NJC's damages argument based on its attempt to distinguish between damages allegedly incurred by CMS versus Ganassi Group is unavailing.

**B.**      **Ganassi Group – The Lease**

Next, NJC contends that Ganassi Group is neither a party to the Lease nor a third-party beneficiary of the Lease and thus cannot pursue claims based on an alleged breach of the Lease. This argument relates to Counts II and IX of Ganassi Group's counterclaims. The parties to the Lease were NJC (landlord) and CMS (tenant), while Mr. Ganassi's execution of the guaranty meant that pursuant to the guaranty, Mr. Ganassi was also bound by the Lease.

In response, the defendants assert that Mr. Ganassi was a party to the Lease. Dkt. 348 at 6-7. They do not, however, point to any authority indicating that Mr. Ganassi is interchangeable with Ganassi Group, so that Ganassi Group can proceed with breach of contract claims directed at the Lease when it is not itself a party to the Lease.

Because Ganassi Group only discusses Mr. Ganassi's connection to the Lease in its response and does not point to evidence supporting an inference that it was either a party to the Lease or an intended third-party beneficiary of the Lease, Ganassi Group has forfeited any claim that it – as opposed to Mr. Ganassi – can proceed on a breach of contract claim based on the Lease.

In any event, however, the court notes that while Counts II and IX of the defendants' counterclaims are directed at both the Lease *and* the Operating Agreement, the verdict form (dkt. 322) only addresses the Operating Agreement, and *not* the Lease. NJC's motion for judgment as a matter of law as to the portions of Counts II and IX of Ganassi Group's counterclaims directed at the Lease must, therefore, be denied as the jury did not render a verdict in favor of Ganassi Group regarding the Lease.

## C. Rescission

According to NJC, the Ganassi Defendants did not offer evidence showing that National Jockey Club, Mr. Ganassi and Ganassi Group can be restored to the status quo ante. NJC thus contends that the Ganassi defendants cannot attempt to rescind the Lease or Operating Agreement. *See Martin v. Heinhold Commodities*, 643 N.E.2d 734, 746 (Ill. 1994) ("the restoration of the party against whom the relief is sought, or the offer to restore him, to the

position which he occupied before the transaction complained of took place, is a condition precedent to the right to rescind").

The court disagrees with the Ganassi Group's contention that the court already resolved this issue in its favor. In fact, the court expressly reserved judgment on this question. *See* Dkt. 253 at 8-11. The parties then rely on their arguments presented in connection with Mr. Ganassi's memorandum in support of his counterclaim for recission. The court will address the recission issue below in § V of this opinion.

### E. NJC's Motion for a New Trial

NJC argues that it is entitled to judgment as a matter of law as to Ganassi Group's rescission counterclaim (Count X). As noted above, in support it directs the court's attention to §§ (A) and (B) of its original motion for judgment as a matter of law, Dkt. 316. These sections do not discuss rescission. NJC expands on its arguments about rescission/a new trial in its reply, Dkt. 356, but this is too little, too late. *See, e.g., Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (arguments raised for the first time in a reply brief are forfeited). The fact that NJC did not present its arguments in its opening motion explains why the Ganassi defendants did not respond to the request for a new trial. Thus, NJC's motion for a new trial on this basis is denied.

In any event, the rescission issue does not appear to be a proper subject for a new trial, as this issue is equitable and thus was carved out by the court and not considered by the jury. In addition, as detailed in § V of this opinion, with respect to the bench trial portion of this case, the court finds that Mr. Ganassi is not entitled to rescission. Accordingly, the court need not further discuss NJC's arguments about rescission in the context of a motion for a new trial.

**III.     Mr. Ganassi's Motion for Judgment as a Matter of Law**

At trial, NJC asserted a single claim – that Mr. Ganassi breached the guaranty.  In his motion for judgment as a matter of law, Mr. Ganassi contends that NJC failed to prove this claim as a matter of law because: (1) NJC's termination of the Lease also terminated the guaranty and thereby relieved Mr. Ganassi of his obligations under the guaranty; (2) NJC wrongfully terminated the Lease, and is not entitled to benefit from a breach of contract it caused; (3) NJC failed to prove that CMS owed any rent under the Lease so CMS was not in default and, hence, no liability can be imposed on Mr. Ganassi; and (4) Mr. Ganassi satisfied his obligations under the guaranty by paying more than he was required to pay.

**A.     Did NJC Wrongfully Terminate the Lease?**

Mr. Ganassi contends that NJC wrongfully terminated the Lease and that this action terminated the guaranty and relieved him of his obligations under the guaranty.  Specifically, he asserts that: (1) the guaranty was part of the Lease and did not survive termination of the Lease; (2) § 14 of the Lease did not extend the guaranty beyond the date of the Lease's termination; and (3) Mr. Ganassi did not consent to extend his obligations under the guaranty beyond the date of the Lease's termination.

Among other things, the guaranty required Mr. Ganassi to "personally guaranty repayment of fifty percent (50%) of funds borrowed to make Landlord Improvements . . . limited to a maximum personal guaranty of $22,500,000.00."  NJC's Ex. 28.  The parties disagree as to whether the guaranty survived the termination of the Lease.  According to Mr. Ganassi, the guaranty was part of the Lease and hence could not survive termination.  The parties each claim

that the guaranty's plain language supports their position, and witnesses testified in support of each position.

Section 14(a) of the Lease provides: "In the event of any material default of this Lease by Tenant [CMS], Landlord [NJC], at its option, may terminate this Lease upon and by giving written notice of termination to Tenant [CMS], which termination shall not affect Tenant's [CMS's] liability for all sums which are, or may be, due under this Lease." NJC's Ex. 28.

Thus, the guaranty guaranteed repayment of up to $22,500,000.00 of the monies borrowed to make improvements, and the Eighth Amendment subsequently reduced the amount of the guaranty. Moreover, under § 14(a) of the Lease, CMS's obligation to pay for sums it owed survived the termination of the Lease. The guaranty did not contain any temporal restrictions, as it merely guaranteed repayment of monies loaned to CMS. A guaranty on a lease survives the lease's termination if the guarantor agrees to guarantee payments that survive the termination. *T.C.T. Bldg. Partnership v. Tandy Corp.*, 323 Ill.App.3d 114, 118-19 (1st Dist. 2001). This is precisely what happened here, as Mr. Ganassi agreed to guarantee repayment of money loaned to CMS, and the Lease provided that termination of the Lease would not affect CMS's liability for money owed under the Lease. *U.S. Shoe Corp. v. Hackett*, 793 F.2d 161, 165 (7th Cir. 1986) ("[the plaintiff] was entitled to rely on the guaranty as written, not as limited by the [the defendants'] interpretation of its original purpose. Objective readings of financial instruments promote commercial transactions").

The fact that the guaranty states that it is part of the Lease is thus irrelevant. Mr. Ganassi's arguments that NJC wrongfully terminated the Lease and wrongfully diverted at least $4M of CMS's funds also have no bearing on whether the guaranty survived termination of the

Lease, *see* Dkt. 343 at 5-11, since the Lease and guaranty's plain language, when read together, establish that the guaranty existed to induce the banks to provide the Construction Loan. *See* NJC Ex. 85 (Harris Bank "Summary of Terms and Conditions" sheet for the construction loan dated July 8, 1998). Finally, the notion that Mr. Ganassi was required to somehow separately consent to liability on the guaranty post-termination of the Lease is incorrect. His obligations under the guaranty became binding when he executed it, and he was not entitled to decide whether to reaffirm those obligations at a later date.

In short, having considered all of the evidence, including the plain language of the documents at issue, the court simply does not accept that the banks would have extended the Construction Loan without a guaranty of repayment that would exist if the parties' deal fell apart. Mr. Ganassi's arguments about termination are thus unpersuasive.

**B.      CMS's Rent Payments Under the Lease**

Mr. Ganassi next argues that he cannot be liable under the guaranty unless CMS first defaulted under the Lease. He acknowledges that CMS was obliged to pay "rent" but asserts that CMS was current with its rent at the time of termination, as "[a] search of the trial record discloses no evidence supporting claims that CMS owed $10,500,000 or $8,500,000, or any other amount of rent." Dkt. 264 at 9. He also contends that nothing is due under the note now owned by DII Northwest. Dkt. 343 at 13. Thus, he concludes that CMS was not in default so he should not be held liable under the guaranty.

The parties do not appear to dispute that "rent" payments were payments of principal plus interest on the Construction Loan. Ample evidence indicated that CMS was not current with payments on the Construction Loan. For example, Ganassi Group's final payment towards CMS

was for payroll in January of 2002 and Harris Bank sent a notice of default (Defendants' Ex. 106) in February of 2002. NJC terminated the Lease in October of 2002, after many months of non-payment by CMS on the Construction Loan.

To the extent that Ganassi Group contends that its obligations toward CMS were satisfied because it paid more towards the Construction Loan than NJC did at certain points, the court heard in exhaustive detail about NJC's payments towards CMS's operating expenses (not just the loan) and the parties' views about the propriety of NJC and CMS's accounting practices. In light of the evidence presented at trial, the jury could and did find that CMS was in default due to failure to remain current with payments on the Construction Loan, so NJC was entitled to terminate the Lease.

In addition, Mr. Ganassi's observations about the note are simply irrelevant. The Construction Loan indisputably was not current when NJC terminated the Lease, and this – not any obligation of any other entity or person under any other document to any other person or entity – entitled NJC to terminate the Lease. The defendants' attempts to obfuscate the issues by relying on the traditional definition of rent and quoting selectively from documents is thus unavailing.

## C. Did NJC Breach the Lease?

Mr. Ganassi next asserts that NJC (not CMS or Mr. Ganassi) breached the Lease by wrongfully terminating the Lease even though CMS was not in default. In support, he argues that NJC diverted CMS funds for its own use and underfunded its portion of the CMS rent payments while simultaneously operating its own horse-racing business. The court has already rejected Mr. Ganassi's argument that CMS was not in default because it was current with rent

(i.e., Construction Loan) payments. It adds that its task at the post-trial stage is to determine if the record shows that Mr. Ganassi was entitled to judgment as a matter of law, not to reweigh all of the evidence. *See Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010) (when considering a motion for judgment as a matter of law, the court must consider "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed"), *quoting Tammi v. Porsche Cars N. Am., Inc.*, 536 F.3d 702, 707 (7th Cir. 2008).

### D. Do Mr. Ganassi's Contributions to CMS Extinguish His Obligations Under the Guaranty?

Finally, Mr. Ganassi argues that he is entitled to judgment as a matter of law because he contributed more money to CMS than the cap set by the guaranty. The court strongly disagrees. Mr. Ganassi's argument is based on his belief that the guaranty acted as a note, so any payments made to CMS by him or his organizations reduced the total amount of money he was personally required to pay towards the CMS project if things went south.

A note and a guaranty are not interchangeable, as "[a] claim on a note depends on the borrower's promise to pay; a claim on a guaranty depends on the lender's inability to collect from the borrower." *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 569 F.3d 667, 672-73 (7th Cir. 2009). Mr. Ganassi acknowledged at trial that the guaranty was just that: a guaranty that required him to pay up to the amount then in effect if the underlying note was not repaid. His argument during and after trial that the guaranty is in fact a note is inconsistent with the evidence presented

at trial indicating that Mr. Ganassi signed the guaranty and Teams pledged the CART stock as security for the underlying loan.

Moreover, the guaranty's express language required the Bank Group to consent to reduce the amount of the guaranty. They consented as part of the execution of the Eighth Amendment, and the amount of the guaranty was reduced. The Bank Group did not otherwise consent to reduce the amount of the guaranty. The idea that each penny contributed to CMS by Mr. Ganassi or an entity he controlled reduced the amount of Mr. Ganassi's personal guaranty is, therefore, incorrect as a matter of basic contract interpretation.

Moreover, Mr. Ganassi's argument ignores the fact that Ganassi Group is not interchangeable with Mr. Ganassi himself. Ganassi Group was part of CMS, along with NJC. Even if Mr. Ganassi was the source of part of Ganassi Group's payments to CMS, Ganassi Group was legally responsible for its own payments, and Mr. Ganassi's personal guaranty (up to the amount of the guaranty at the relevant time) guaranteed CMS's payments. The jury was entitled to, and did, make this distinction. Accordingly, for all of the above reasons, Mr. Ganassi's motion for judgment as a matter of law is denied.

## IV.    Mr. Ganassi's Motion for a New Trial

Mr. Ganassi asserts that the $8,500,000 jury verdict in favor of NJC on its breach of guaranty claim is against the manifest weight of the evidence. He also contends that the court erroneously admitted the expert testimony of Shepard Pryor IV regarding banking practices. Third, he argues that the jury's verdict in favor of NJC on the breach of guaranty claim is inconsistent with its verdict on Ganassi Group's breach of contract claim. Finally, he contends that the verdict is not supported by the evidence.

### A. Weight of the Evidence

Mr. Ganassi asserts that the $8,500,000 jury verdict in favor of NJC on its breach of guaranty claim is against the manifest weight of the evidence. In support, he incorporates a prior motion raising this argument, and in response, NJC incorporates its prior response.

A party who contends that a jury verdict was contrary to the manifest weight of the evidence can prevail "only if no rational jury could have rendered the verdict." *Lewis v. City of Chicago Police Dept.*, 590 F.3d 427, 444-45 (7th Cir. 2009) (internal quotations omitted). When considering a motion for a new trial, "[t]he reviewing court must view the evidence in the light most favorable to the prevailing party, leaving issues of credibility and weight of evidence to the jury." *Id*.

The court declines to allow the parties to circumvent the page length limitations it set by incorporating prior filings. As demonstrated by the numerous pre- and post-trial oversized briefs authorized in this action, it would have considered a reasonable request for additional pages so the parties could submit briefs addressing all of their post-trial arguments. In any event, as discussed above, the jury's verdict on NJC's claim for breach of the guaranty was supported by evidence, especially given that for purposes of a motion for a new trial, the court must evaluate the evidence about the breach of the guaranty in the light most favorable to NJC. Mr. Ganassi's request for a new trial based on the sufficiency of the evidence is thus denied.

### B. Shepard Pryor IV

Next, Mr. Ganassi contends that the court erroneously admitted the expert testimony of Shepard Pryor IV regarding banking practices. The court largely denied the defendants' motion in limine regarding Mr. Pryor prior to trial and denied the defendants' renewed request to bar Mr.

Pryor's testimony at trial.  *See* Dkt. 253 (opinion addressing the parties' motions in limine) & 311 (order addressing motion to reconsider).

As the court previously noted, Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony in federal court.  *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006).  Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In turn, under *Daubert*, this court must function as a "gatekeeper" to "ensure the reliability and relevancy of expert testimony."  *Id*. at 607, *quoting Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  To perform the gatekeeping function, the court must focus on the expert's methodology, *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000), and consider whether the expert's work is "reasoned, uses the methods of the discipline, and is founded on data," *Naeem*, 444 F.3d at 608, *quoting Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

Mr. Ganassi is entitled to a new trial based on the admission of Mr. Pryor's testimony only if the court concludes that its prior decision was erroneous and that refusing to grant a new trial is "inconsistent with substantial justice."  *Liu v. Price Waterhouse LLP*, 302 F.3d 749 (7th Cir. 2002) (the trial court's evidentiary rulings should be revisited only if they were erroneous

and substantially influenced the jury").  In his motion for a new trial, Mr. Ganassi contends that

he met this difficult standard because:  (1) Mr. Pryor's testimony was not reliable because he was

not qualified; (2) Mr. Pryor's opinions about the guaranty are irrelevant because Harris Bank is

not a party to Mr. Ganassi's guaranty and did not participate in its negotiation; (3) Mr. Pryor did

not discuss the guaranty with any of the parties involved; (4) the promissory note for the

construction loan agreement is currently owned by DII Northwest; and (5) Harris did not sue Mr.

Ganassi.  The court has considered these arguments before, but begins with the threshold issue of

whether Mr. Pryor was a proper expert.

### 1.        Mr. Pryor's Qualifications

Mr. Ganassi's position at trial was that payments made pursuant to the construction loan

agreement extinguished any monies owed under the guaranty (*i.e.*, that the guaranty essentially

was a note that was reduced by cash contributions made by Mr. Ganassi to the CMS project).  In

response, NJC offered, among other things, expert testimony from Mr. Pryor based on his

extensive experience in relevant aspects of the banking industry.  The court declines to endorse a

blanket rule holding that experts may not testify based on their professional experience.  *See, e.g.,*

*United States v. Conn*, 297 F.3d 548, 556-57 (7th Cir. 2002) (an ATF agent "employed a

recognized and valid methodology when he characterized the nature of Mr. Conn's firearms on

the basis of his earlier training and experience with both collectible firearms and those that were

not").

With the benefit of the trial, the court is also convinced that Mr. Pryor's testimony was

helpful to the jury, which was faced with the daunting prospect of a seemingly endless parade of

accountants and a very complex, multi-layered transaction with many technical terms.  The court

thus rejects Mr. Ganassi's third attempt to attack Mr. Pryor, whose testimony was limited to his opinions about the banking industry and was subject to extensive cross-examination. *See* Dkt. 253 (opinion addressing the parties' motions in limine) & 311 (order addressing motion to reconsider).

### 2. Is Mr. Pryor's Testimony Relevant Since Harris Bank Did Not Sign or Directly Negotiate the Guaranty?

Mr. Ganassi contends that the Bank Group has no connection to the guaranty because Harris Bank neither signed nor negotiated it. The guaranty existed, however, only because the banks required it in order to loan a very substantial amount of money. *See* NJC Ex. 85 (Harris Bank "Summary of Terms and Conditions" sheet for the construction loan dated July 8, 1998) (requiring an "executed Lease for motor speedway with personal guaranty of Mr. Ganassi up to $22,500,000.00" as a condition precedent for over $60 million in loans). Moreover, as Mr. Ganassi acknowledges, the guaranty was part of the Lease, and thus was assigned to the Bank Group. *See* Dkt. 340 at 10.

The Bank Group's perspective on the guaranty is also germane because the guaranty required the Bank Group to consent to reduce the amount of the guaranty. This is consistent with the fact that the Eighth Amendment (to which the banks comprising the Bank Group were parties and signatories along with Mr. Ganassi and NJC) reduced the amount of the guaranty to $10,500,000. *See* NJC Ex. 102 (Eighth Amendment). The Bank Group thus cannot be distanced from the guaranty.

Finally, Lana Powers, a Harris Bank workout loan officer who deals with distressed loans, testified that the guaranty was part of the collateral for the construction loan and testified

about the banks' insistence on the guaranty as part of the loan process as well as their involvement in the negotiation and execution of the Eighth Amendment.

The court thus concludes that the guaranty did not exist in a vacuum and rejects the notion that testimony about how banking industry professionals would view the guaranty was irrelevant. Mr. Ganassi's position that the guaranty essentially acted as a note because all of his cash contributions to the CMS project offset any monies owed under the guaranty made Mr. Pryor's testimony relevant and helpful to the jury as it considered whether to accept that position. Mr. Ganassi's relevancy argument thus does not justify a new trial.

### 3. Mr. Pryor's Lack of Personal Involvement With the Guaranty

Mr. Ganassi also asserts that Mr. Pryor's testimony was improper because while he reviewed documents, he never discussed the guaranty with NJC, Mr. Ganassi, or the banks. Mr. Ganassi thus concludes that Mr. Pryor could not opine about the intentions of the parties or banks. The court, however, barred Mr. Pryor from offering any such testimony. *See* Dkt. 311. Accordingly, this argument is a non-starter.

### 4. Current Owner of the Promissory Note for the Construction Loan

Mr. Ganassi also refers to the fact that the promissory note for the construction loan agreement is currently owned by DII Northwest, who purchased the note from the bank group and called it, causing NJC's bankruptcy. Dkt. 340 at 12. He then asserts that DII Northwest "did not agree to any of [the] conditions that Mr. Pryor now imposes on him by virtue of the alleged customs and practices of the banking industry." *Id*. The fact that DII Northwest was not involved with the guaranty while the CMS project was still alive is irrelevant. Mr. Pryor did not impose any conditions on any of the parties. He merely opined about how banks would generally

view guaranties like the one at issue in this case, and was cross-examined at length about those opinions.

The court also notes that none of the individuals who were involved in the transaction "imposed conditions" on the guaranty. For example, Lana Powers testified that a reduction in the guaranty required written approval by Harris Bank and the consent of the other participating banks. Moreover, Mr. Ganassi has not pointed to any evidence showing that DII Northwest's purchase of the promissory note "imposed conditions" on the guaranty, which was executed long before the promissory note changed hands. Mr. Ganassi's arguments about DII Northwest are thus unpersuasive.

### 5. Is the Bank Group's Perspective Relevant Only if the Banks Are Parties?

None of the banks sued Mr. Ganassi. Mr. Ganassi states that "this is not surprising, given that the Guaranty contains no provision requiring consent or acknowledgment by NJC or Harris Bank for the Guaranty to be reduced." Dkt. at 12. This is besides the point. As noted above, the guaranty existed because the banks required it to loan money. Mr. Ganassi points to no authority indicating that they were required to sue him directly based on an alleged failure to satisfy his obligations under the guaranty.

In sum, at the post-trial stage, the parties may not relitigate evidentiary issues afresh. Mr. Ganassi is entitled to a new trial based on the admission of Mr. Pryor's testimony only if the court finds that its prior rulings were erroneous and a new trial is necessary to effect substantial justice. Mr. Ganassi has not satisfied either of these prongs, so his request for a new trial based on the narrow testimony from Mr. Pryor about banking practices is denied.

### C.     Allegedly Inconsistent Jury Verdict

Mr. Ganassi's final argument in support of his motion for a new trial is a convoluted claim that the jury's verdict in favor of NJC on the breach of guaranty claim is inconsistent with its verdict on the Ganassi Group's breach of contract claim. NJC characterizes Mr. Ganassi as arguing "that it is inconsistent for the jury to have found that NJC performed its obligations under the Lease in awarding it a recovery against Mr. Ganassi on his guaranty and at the same time have found that NJC, as tenant, caused or contributed to CMS's default under the Lease." Dkt. 354 at 17 (internal citations omitted).

The court agrees with NJC that this is not a fair characterization of the jury verdict. The jury found in favor of Ganassi Group on its counterclaim based on NJC's breach of § 6.1 of the Operating Agreement. *See* Dkt. 322 (jury verdict). Moreover, CMS was the tenant. It is true that NJC and Ganassi Group together comprised CMS, but NJC by itself was the landlord. The jury verdict simply does not support the notion that the jury found that NJC by itself was the tenant and as such, caused or contributed to CMS's default under the Lease.

In addition, the claims are based on two different underlying documents. When the jury awarded NJC damages based on Mr. Ganassi's breach of the guaranty, it necessarily found in favor of NJC on its breach of contract claim based on the guaranty, which was attached to the Lease. Ganassi Group was neither a party to the Lease nor the guaranty. The jury also found in favor of Ganassi Group on its counterclaim against NJC based on the Operating Agreement.

When viewed from this perspective, the verdict is entirely consistent. Because the court must review jury's "findings in the light most favorable to the verdicts," *Fox v. Hayes*, 600 F.3d 819, 844 (7th Cir. 2010), and a "plausible explanation for the verdict" exists, *Carter v. Chicago*

*Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998), Mr. Ganassi is not entitled to a new trial based on the jury's verdict.

### D. Sufficiency of the Evidence

Mr. Ganassi contends the evidence is insufficient to support the jury's verdict on NJC's breach of contract claim based on the guaranty. In support, he incorporates a prior motion that the court has already rejected that contains this argument. Incorporation of prior motions violates the court's order setting a page limit for the motion presently before the court. In any event, the court declines to revisit its prior ruling about the sufficiency of the evidence as Mr. Ganassi's view of the evidence is one-sided and highly colored.

For example, the court found that much of his testimony about the guaranty was evasive and not credible. His insistence that a "cc" next to his name on a letter relating to the CMS transaction could not mean that he received a copy because the writer did not place a checkmark next to his name is illustrative: given his background, business dealings, and involvement in Ganassi Group, CMS, and other ventures, his professed lack of knowledge about evidence that did not support his cause and keen grasp of evidence favoring his position meant that he was not a compelling witness. *See* Transcript at 1224-26.

Moreover, ample evidence – including the Eighth Amendment, which formally decreased the amount Mr. Ganassi owed under the guaranty, and Lana Powers' testimony that a reduction in the amount of the guaranty required approval by Harris Bank and the consent of the other banks – supported NJC's theory that payments to CMS did not automatically decrease Mr. Ganassi's liability on the guaranty. Accordingly, this basis for a new trial is unavailing.

**V.    Mr. Ganassi's Request for Rescission of the Guaranty or, Alternatively, a Finding That Set-off Is Proper**

Mr. Ganassi seeks to rescind the Lease and guaranty.  Alternatively, he asks the court to set-off the jury's award of damages in favor of NJC on its claim for breach of the guaranty against the jury's award of damages in favor of Ganassi Group on its counterclaim for breach of the Operating Agreement.  For the following reasons, he is not entitled to this relief.

**A.    Rescission**

Mr. Ganassi contends that he is entitled to rescission because: (1) NJC breached the Lease by failing to use its best efforts to remove the necessity for the guaranty; and (2) NJC wrongfully terminated the CMS Lease.  It is only necessary to address two of NJC's many arguments about rescission:  that Mr. Ganassi failed to plead a claim for rescission of the guaranty and the remedy of rescission is unavailable because the parties cannot be restored to the status quo ante.

NJC asserts that Mr. Ganassi forfeited his current argument that the Lease and guaranty should be rescinded because his rescission counterclaim is directed at the Lease and Operating Agreement, not the guaranty.  *See* Dkt. 85 at 23.  NJC also stresses that Mr. Ganassi referred to the guaranty separately elsewhere in the counterclaims, but did not do so in his rescission counterclaim.  It thus concludes that Mr. Ganassi failed to plead a claim for rescission of the guaranty and sandbagged it by changing theories after trial.

The court disagrees.  While the guaranty and Lease were separate documents, the guaranty was executed in connection with the Lease, and if the Lease is rescinded, the guaranty would not be necessary as there would be no underlying obligation to guarantee.  Moreover, before and during trial Mr. Ganassi made it clear that he was attempting to walk away from the

guaranty based on a host of theories.  Accordingly, Mr. Ganassi's equitable claim for rescission is properly before the court.

The request for rescission nevertheless is unavailing as a matter of law as an "element necessary for a rescission cause of action is a showing that the parties can be restored to the status quo ante." *Horwitz v. Sonnenschein Nath and Rosenthal LLP*, 399 Ill.App.3d 965, 975 (1st Dist. 2010) (collecting cases).  This requires the party seeking rescission to "return of any property or other consideration that has passed to the rescinding party under the contract" and "also generally requires the rescinding party to account for any benefits received from the other party under the contract."  *Id*. (internal citations and quotations omitted).

In his opening memorandum, Mr. Ganassi contends that the parties can be restored to the status quo ante as of the time that NJC terminated the Lease because the court can cancel his guaranty, and that the court is not required to restore NJC to its pre-guaranty condition because NJC has filed for bankruptcy and thus cannot refund any rent payments back to CMS.[3]  This argument is a non-starter because the status quo ante refers to the time that the contract was formed.  *International Ins. Co. v. Sargent & Lundy*, 242 Ill.App.3d 614, 629 (1st Dist. 1993) (collecting cases).  Mr. Ganassi's proposed time machine is thus set to the wrong date, as the relevant moment is when the parties executed the Lease.

In any event, Mr. Ganassi's attempt to absolve himself of any effort to restore NJC to the position it was in prior to the termination of the Lease would have been unavailing even if the date of the Lease's termination was relevant for purposes of rescission.  The fact that NJC has

---

[3]  The Bank Group loaned money based on the existence of the guaranty.  The parties do not address whether the banks would need to be restored to the status quo ante.  The court will not do so either, as for the reasons discussed below, Mr. Ganassi's rescission claim fails.

filed for bankruptcy and lost Sportsman's Park shows that it is impossible to restore the status quo ante. The contention that the status quo ante cannot be restored so Mr. Ganassi should be excused from demonstrating that it can be restored shows Mr. Ganassi cannot prevail, not that he should be excused from proving a necessary element of a rescission claim.

Perhaps recognizing the flaws in this argument, Mr. Ganassi provides a fallback position: that he need not prove this element because NJC has unclean hands as NJC's conduct prevented Mr. Ganassi from being able to restore the status quo ante. *See, e.g., International Ins. Co. v. Sargent & Lundy*, 242 Ill.App.3d 614, 629 (1st Dist. 1993) ("Restoration of the status quo ante will not be required when restoration has been rendered impossible by circumstances not the fault of the party seeking rescission, and the party opposing the rescission has obtained a benefit from the contract").

This exception to the normal status quo ante requirement does not help Mr. Ganassi because it requires the court to accept that NJC was unilaterally responsible for the circumstances leading up to the termination of the Lease (*i.e.*, the failure of the CMS project and the inability of CMS to generate enough revenue to service CMS's debt). The jury did not make any such finding, as its verdict in favor of the Ganassi Group was based on its finding that NJC breached § 6.1 of the Operating Agreement, which as noted above provided that:

> 6.1    Authority: Liability to Third Parties; Member Independence. No Member has the authority or power to act for or on behalf of the Company to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court. Except as otherwise specifically provided herein, neither the Company nor any Member shall have any rights in or to any ventures pursued by any other member or the income or profits therefrom, whether taking place at Sportman's Park, Cicero, Illinois[,] or elsewhere.

NJC Ex. 29, § 6.1.

While the parties and their army of accountants presented differing views of CMS's financial management, a finding that NJC breached § 6.1 of the Operating Agreement is not synonymous with a finding that NJC mismanaged CMS's books and records, wrongfully diverted funds, or materially breached the Lease. Moreover, in reaching a verdict in favor of NJC on the breach of guaranty claim against Mr. Ganassi, the jury rejected Mr. Ganassi's claim that NJC wrongfully terminated the Lease and failed to use its best efforts to remove or vacate Mr. Ganassi's obligation to maintain the guaranty.

Mr. Ganassi, therefore, has failed to point to evidence demonstrating that NJC's conduct prevented him from being able to restore the status quo ante requirement. This means that he must establish that the parties can be restored to their pre-contract positions. Because he cannot do so, his request for rescission of the Lease and guaranty is unavailing.

### B.       Set-Off

"The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995), *quoting Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528 (1913). Mr. Ganassi asks the court to set-off the jury's award of damages in favor of NJC on its claim for breach of the guaranty against the jury's award of damages in favor of Ganassi Group on its counterclaim for breach of the Operating Agreement. In response, NJC contends that Mr. Ganassi's requested set-off is an affirmative defense, as opposed to a counterclaim, and thus is procedurally barred from receiving a set-off. Alternatively, NJC contends that the request for set-off fails on the merits.

The court need not reach NJC's procedural argument as even assuming that Mr. Ganassi properly preserved his claim for set-off, he is not entitled to the requested relief. To be entitled to set-off under Illinois law, Mr. Ganassi must establish that the two jury awards are: (1) mature; (2) liquidated; and (3) mutual. *In re Clark Retail Enterprises, Inc.*, 308 B.R. 869, 896 (Bkrtcy. N.D. Ill. 2004). The court's consideration begins and ends with the mutuality requirement.

"Courts have uniformly construed 'mutuality' to mean that the debts must be in the same right and between the same parties, standing in the same capacity and same kind or quality." *Id.* at 896-97 (internal quotations omitted); *see also In re Doctors Hosp. of Hyde Park, Inc.*, 337 F.3d 951, 955 (7th Cir. 2003) ("the general rule is that mutuality is satisfied when the offsetting obligations are held by the same parties in the same capacity (that is, as obligor and obligee) and are valid and enforceable"). Mr. Ganassi argues that set-off of his liability to NJC against NJC's liability to Ganassi Group's liability is appropriate because "the evidence established that Ganassi Group and Mr. Ganassi[] were one and the same, and that Mr. Ganassi was the real party in interest" for the contracts executed by Ganassi Group. Dkt. 337 at 17.

The court strongly disagrees with this characterization of the evidence. It is true that at trial, Mr. Ganassi argued that he was one and the same as Ganassi Group. However, the evidence was to the contrary. The fact that Mr. Ganassi – a member of Ganassi Group LLC – testified that he paid Ganassi Group's debts to CMS does not wipe away Ganassi Group's separate legal existence. Mr. Ganassi cannot have it both ways. He formed Ganassi Group on the advice of counsel to insulate himself from personal liability. *See* Tr. 1159: 12-24 (Mr. Ganassi formed Ganassi Group upon advice of counsel); Tr. 1885:4-13 (Mr. Pietragallo, Mr.

Ganassi's lawyer, testified that Ganassi Group was formed to insulate Mr. Ganassi from personal liability).

LLC members are not liable for the LLC's debts. *Valinote v. Ballis*, 295 F.3d 666, 668 (7th Cir. 2002). However, the mere fact that a member paid LLC debts does not mean that the existence of the LLC has no legal significance. This is especially true given that Mr. Ganassi was not the only member of Ganassi Group and Mr. Ganassi and Ganassi Group were parties to different contracts relating to CMS. In sum, Mr. Ganassi's argument that he is one and the same as Ganassi Group LLC is simply wrong. His remaining arguments about set-off do not merit discussion.

## VI. Conclusion

For the above reasons, NJC's renewed motion for judgment as a matter of law as to defendants' counterclaims or, in the alternative, for a new trial [#335] and Mr. Ganassi's renewed motion for a new trial [#339] and motion for judgment as a matter of law [#342] are denied. In addition, the court finds that Mr. Ganassi is not entitled to rescission or a set-off and thus denies the relief sought in Mr. Ganassi's memorandum addressing these issues [#337]. The clerk is directed to enter a Rule 58 judgment and terminate this case from the court's docket.

DATE:   September 14, 2010

Blanche M. Manning
United States District Judge